SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------X

In the Matter of the Application for          :
Letters of Temporary Administration                    **Affidavit**
of the Goods, Chattels and Credits of

        KATHLEEN DURST,                            :

            An Absentee.                          ;

-------------------------------------------X

STATE OF NEW YORK          )
                    : ss.
COUNTY OF NEW YORK       )

       ROBERT DURST, being duly sworn, deposes and
says:

       1.  I am the husband of Kathleen Durst, the
Absentee named in these proceedings.  I submit this
affidavit in support of the issuance of Letters of Tempor-
ary Administration to the Public Administrator, but failing
such appointment, then in support of the issuance of Letters
to me.  I also submit this affidavit in opposition to the
application of Anne Kathleen McCormack and her daughter,
Mary Hughes, for the issuance of such Letters to Mrs. McCormack
and specifically in response to the scurrilous, unfounded and
false statements which appear in the affidavit of Mary Hughes,
sworn to January 29, 1983.

       2.  I am entitled to and am qualified to be the Adminstra-
tor of my wife's assets.  The papers submitted by my mother-in-
law and sister-in-law, Mary Hughes, exhibit the animosity

which they both harbor against me.  I intend to preserve some sort of familial relationship with Kathy's family, certainly pending her return and avoid deterioriation of that relationship.  For that reason alone, it seems to me and to my counsel that the appointment of the Public Administrator is a sensible solution.  I am willing to defer to the Public Administrator, however, only for this purpose. If the Public Administrator should not be appointed, I urge that I be appointed.

3.  The application by Mrs. McCormack and Mary Hughes is made in the guise of protecting my wife's assets.  My counsel has already established by the papers heretofore submitted that if, heaven forbid, my wife should not return, neither her mother nor sister will have any right to participate in the assets as they will be inadequate for that purpose.  I think the Court also should know that all of the assets were given to her by me.  The old Mercedes car, which Mary Hughes constantly remarks on to the press, was bought by me and was used by Kathy and me as our family car.  I am perfectly willing to regard the car as her property and indeed, I did put title in her name.

4.  Almost without exception, no statement in the affidavit of Mary Hughes is true.  The affidavit takes its basis from unnamed persons and unidentified sources together with clippings from newspaper articles, none of which are factually correct.

-2-

a.   I am not privy to any information concerning Kathy's disappearance which I have not disclosed to Kathy's family, to the Police Department and to those who, at my own expense, I have engaged to investigate her disappearance and to search for her.

b.   I have no responsibility in any manner direct or indirect for Kathy's disappearance.  I believe that Kathy is alive and neither my privately conducted investigation nor the police investigation have developed contrary information.  Indeed, Mary Hughes is alone in her claim that Kathy is dead. She was very quick after Kathy's disappearance to adopt this view and not three weeks had passed when she insisted that I deliver Kathy's personal effects to her for whatever use she and her mother wished to make of them.  This I refused to do which apparently engendered some of the animosity against me which she thereafter displayed.

c.   I have not disposed of any of Kathy's belongings or personal property and the allegations to the con-trary made in Mary Hughes' affidavit are false.

d.   I never threatened her life or threatened her in any way, or assaulted Kathy or caused her any physical harm or abuse.  The only testimony to the contrary in Mary Hughes' affidavit in which she attempts to relate an incident at a Christmas party is false.

-3-

While Kathy was considering a formal separation
agreement or a post-nuptial agreement with me,
she had been advised by one or the other of her
attorneys who were negotiating this subject with
my attorneys that she would be in a more advan-
tageous negotiating position if she could estab-
lish that I had physically abused her.  During
the period of these negotiations, Kathy told me
that although she knew her statements were untrue,
that she had made them in order to advance her
case.

e.  At no time did Kathy and I discuss divorce.
Her attorneys spoke with my attorneys concerning
a post-nuptial agreement.  As Mrs. McCormack
acknowledges in Paragraph 3 of her petition, Kathy
and I were living together at 37 Riverside Drive
at the time of her disappearance.  Kathy had not
lived separately in our East 86th Street apartment
since June of 1981 when most of her belongings and
furniture were moved to 37 Riverside Drive.

5.  Mary Hughes was a tenant in an apartment that
my family company rented to her on East 51st Street, Manhattan.
She had been given the apartment at a below-market rental as an
accommodation.  In May of 1982 she telephoned me and said that
she wanted the rent on her apartment reduced from $650 to
$200 per month.  I told her that I was unable to accommodate
her.  On June 2, 1982, she telephoned me again.  She pressed

her previous request for a "good deal" on her apartment and
ssid that in addition she wanted me to give her $15,000. I
told her, as I had before, that I could do nothing for her on
the rental of the apartment nor would I give her any money.
She said that there would be a story in the New York Post the
following day, June 3, which I would find abhorrent and she
repeated her request for money. I hung up on her. The next
day, June 3, after a derogatory article about me appeared in
the New York Post, she approached me as I was leaving my resi-
dence, at 441 West 43rd Street, Manhattan. She said she
wanted to talk to me. I said I didn't want to talk to her,
that I was going jogging. She said that I had seen the article
in the New York Post and she now wanted me to give her $100,000.
I ignored her and refused to talk with her.

It is apparent that the false affidavit submitted
by Mary Hughes in this proceeding is as a result of my refusal
to respond to her demands and for the purpose of creating
papers that she can release to the newspapers for publicstion
with impunity. This is consistent with the fact that the
press were advised of the February 1st hearing and that notwith-
standing that the Surrogate excised false and derogatory state-
ments from her affidavit, that the affidavit was released to
the press and printed as shown in the exhibits annexed to our
Memorandum of Law and my attorneys' affidavit submitted herewith.

6. All the statements made in court by Mary Hughes'
attorney, Mr. Boyle, which were obviously directed to the press
for effect rather than to the court, because they were the
grossest hearsay without attribution to an identifiable source,
are not relevant to the hearing and false.

7. Mary Hughes would have the Court believe that she has her sister, Kathy's, interest at heart. Nothing could be further from the truth. During our entire married life, she was jealous of Kathy because of her education and her marriage which resulted in a lack of warm sisterly relations between them. Indeed, when I called Mary Hughes when Kathy disappeared to ask if she had heard from Kathy, she advised me not to be concerned as she and I both knew that Kathy often was away from home and out-of-touch for days at a time. I had the greatest difficulty in enlisting Mary Hughes' assistance in my attempts to locate Kathy. It was only after I refused to give Kathy's possessions to her, and to accede to her repeated demands that she expressed an interest in Kathy's disappearance and sought to use that disappearance against me.

8. It would be the grossest miscarriage of justice to permit Mary Hughes and her mother to misuse these proceedings for the purpose of maligning Kathy and me in the public press. I am unwilling to permit the attorneys for Mary Hughes and my mother-in-law to interfere with the efforts of the police and the private investigators, whom I have engaged, in the on-going search for Kathy merely because they wish to tarnish my name and to plunder her small estate.

_Robert Durst_

Robert Durst

Sworn to before me this
7th day of February, 1983.

_Richard J. Steets_

Notary Public

RICHARD J. STEETS
Notary Public, State of New York
No. 31-4731966
Qualified in New York County
Commission Expires March 30, 1984

—6—