**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------X
ROBERT DURST, :
                                Plaintiff, :      04 Civ. 6981 (RMB)
                                          :
       -against-                   :      **DECISION AND ORDER**
                                          :
RICHARD SIEGLER, JONATHAN DURST, and :
DOUGLAS DURST, individually and as co-trustees:
Of the Robert Durst Trust u/a Dated May 1, 1962 :
And the Robert Durst Trust u/a Dated December :
31, 1962, :
                                Defendants. :
--------------------------------------------------------------X

**I.    Introduction**

On or about August 30, 2004, Robert Durst ("Durst" or "Plaintiff") filed a complaint ("Complaint") against Richard Siegler, Jonathan Durst, and Douglas Durst (together, "Defendants") individually and as co-trustees of certain trusts established for Durst's benefit, asserting unjust enrichment, breach of the trust agreements, and breach of Defendants' fiduciary duties and duties of good faith and fair dealing. The Complaint seeks an accounting, removal of the trustees, unspecified compensatory and punitive damages, attorneys' fees and declaratory judgments that (1) Defendants violated the New York Estates, Powers, and Trusts Law § 7-2.4, and (2) that Defendants' actions are voidable by Durst. (See Complaint at 35-36.)

On or about April 29, 2005, Defendants filed a motion to dismiss the Complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure because "diversity of citizenship does not exist" or, in the alternative, requesting that the Court "abstain from hearing this action in favor of parallel state proceedings in the New York State Surrogate's Court." (See Memorandum of Law in Support of Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative, for Abstention ("Def. Mem."), dated April 29, 2005, at 1.) As a preliminary matter, Durst was incarcerated when this action was filed on August 30, 2004. Prisoners generally are

1

presumed to retain the domicile they had before incarceration. See, e.g., Scott v. Sonnet, Sale, & Kuehne, P.A., 989 F. Supp. 542, 543 (S.D.N.Y. 1998). On or about May 27, 2005, Durst opposed the motion, arguing that "this Court can properly exercise diversity jurisdiction" and that "no exceptional circumstances exist that would warrant or justify abstention." (See Memorandum of Law in Opposition to Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative, for Abstention, dated May 27, 2005 ("Pl. Mem."), at 2-3.) On or about June 17, 2005, Defendants filed their reply. (See Defendants' Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative, for Abstention, dated June 17, 2005 ("Def. Reply").) **For the reasons stated below, Defendants' motion to dismiss the Complaint is granted.**

## II. Background

Robert Durst is the beneficiary of two trusts created by his father on May 1, 1962 ("May 1962 Trust") and December 31, 1962 ("December 1962 Trust") (together, the "Trusts"). (Def. Mem. at 3.) Defendants serve as the trustees of the Trusts.

Robert Durst's Domicile

The Complaint alleges that "Robert Durst is a resident of the State of Texas," and that each of the Defendants is "an individual who resides in the State of New York."[1] (Complaint ¶¶ 5-8.) The parties do not dispute that, until 1998, Durst was a New York domiciliary. (See Pl. Mem. at 5, Def. Mem. at 4-5.) They dispute his place of domicile from 1998 to his arrest on November 30, 2001.

---

[1] Durst requests the Court to "deem the Complaint amended" to "cure" the fact that the Complaint only "alleges Durst's residency, rather than citizenship." (Def. Mem. at 5 n.4.) For the purposes of this motion, the Court deems the Complaint amended to allege that Durst was a Texas domiciliary. See James v. Lan-O-Tone Prods., Inc., No. 88 Civ. 7716, 1989 WL 61852, at *2 (S.D.N.Y. June 7, 1989) (deeming complaint amended based on allegations of plaintiff's citizenship in affidavit by plaintiff's counsel).

2

Beginning in 1995, Durst acquired various condominiums and houses across the United States, including three properties in California, and one in Connecticut. (See Declaration of Charles G. Moerdler, dated April 29, 2005 ("Moerdler Decl.") at Ex. J.) He traveled extensively throughout the country. (Transcript of the Deposition of Robert Durst, dated April 11, 2005 ("Durst Tr.") at 120 ("I don't think I was anywhere for more than six months in any of those years after I left the family business [in 1994].").) In 1998, Durst sold his "primary residence" in New York City, a large cooperative apartment on Greene Street. (Pl. Mem. at 7; Moerdler Decl. Ex. J at 7892-99.) Durst continued to own a smaller condominium on Rector Place, which he purchased in 1997 and sold in May 2002. (Moerdler Decl. Ex. J. at 2400.) (Id. at 2023-25.)

Beginning in 1998, Durst rented an apartment in a luxury apartment building in Dallas, Texas. (Id. at 4698-704.) He leased the Dallas apartment for two one-year periods, and then renewed the lease for six-month terms beginning in June 2000. (Id. at 4712-13.) On October 28, 1998, Durst surrendered his New York driver's license and was issued a Texas driver's license. (See Affidavit of Todd D. Robichaud, dated May 26, 2005 ("Robichaud Aff.") at Exs. 14-15.) On April 11, 2000, Durst registered to vote in Texas. (Pl. Mem. at 10.)

On November 3, 2000, Durst and his longtime girlfriend, Debrah Charatan, obtained a marriage license in New York, and on December 11, 2000, he married Charatan in New York. (Moerdler Decl. Ex. J. at 2639.) Charatan was and continues to be a New York domiciliary. (Robichaud Aff. Ex. 13.)

In November 2000, Durst began to suspect that authorities in New York were about to reopen their investigation of the 1982 disappearance of Durst's first wife, Kathleen. (Moerdler Decl. Ex. I at 37.) In mid-November 2000, Durst flew to Texas and rented a "modest" apartment in Galveston for $300 a month (i.e., in addition to the Dallas apartment referred to above), posing as a mute woman named Dorothy Ciner. (Durst Tr. at 76-77.) He then traveled to his house in Trinidad,

3

California, returned to New York in late December 2000, and then left for Galveston in early January 2001. (Id.) Later in January 2001, Durst flew to California, but returned to New York City and spent most of February 2001 in his Rector Place apartment in New York. (Durst Tr. at 81, 91.)

On March 1, 2001, Durst flew to Dallas. He left for New Orleans on March 13, 2001, where he rented a small apartment disguised as a woman named Diane Wynn. (Durst Tr. at 92-93.) He left New Orleans for California, but returned to New York in early April 2001. (Moerdler Ex. J at 5800-02.) At the end of April 2001, Durst relinquished his apartment in Dallas. (Id. at 4695.) He remained in New York from approximately May 25, 2001 through June 15, 2001, and again from July 18, 2001 through August 8, 2001. (Durst Tr. at 101; Moerdler Decl. Ex. J at 5778-79, 5786-87.) When he was not in New York (between May and August 2001), Durst was either in Galveston or staying in one of several Dallas hotels. As of October 2001, Durst did not have an apartment in Texas (having relinquished his Dallas apartment in April 2001), and he testified that he did not plan to live in his Galveston apartment anymore. (Moerdler Decl. Ex. I at 59-60 ("Q: Were you planning on living in the [Galveston] apartment anymore after that? A: No.").)

On October 9, 2001, Durst was arrested in Galveston, Texas for the murder of an individual named Morris Black. After posting bail, and failing to appear at his arraignment in Galveston on October 16, 2001, Durst left for New Orleans. (Durst Tr. at 96.) On November 30, 2001, Durst was arrested in Bethlehem, Pennsylvania for violating the terms of his Texas bail conditions. Durst told the arresting officer that he lived in New York City, and gave his Rector Place apartment as his home address. (Moerdler Decl. Ex. J. at 736-37 ("Q: Officer Benner, once at the station, did you ask [Durst] . . . for his address? A: Yes . . . I believe it was a New York address. . . . [The arrest report indicates that Durst] gave me an address of 377 Rector Place, New York, New York, 10280.").)

4

After his November 2001 arrest, Durst instructed his wife to sell all of his real estate, and Durst now owns no real property. (Durst Tr. at 118; Transcript of Deposition of Debrah Charatan, dated March 7, 2005 ("Charatan Tr.") at 156.) When this action was commenced on August 30, 2004, Durst was incarcerated in the Galveston County Jail in Texas awaiting trial for alleged evidence tampering and bail-jumping to which he eventually pleaded guilty before the Galveston State District Court on September 29, 2004.[2] Durst was sentenced to five years on each count, to run concurrently with one another. Although Durst was eligible for Texas state parole soon after he was sentenced on September 29, 2004 (having already served nearly three years in Galveston County Jail during and after his murder trial), federal prosecutors filed gun charges against him in Pennsylvania on October 14, 2004, and he was remanded.

On October 25, 2004, Durst pleaded guilty to federal gun charges and was sentenced to nine months in prison, a $30,000 fine, and two years of supervised release by the Hon. Timothy J. Savage of the United States District Court for the Eastern District of Pennsylvania. He was incarcerated at the Federal Correctional Institution in Fairton, New Jersey, and was released on July 15, 2005. (See Transcript of Durst's Federal Sentencing, dated December 21, 2004 ("Fed. Sentencing Tr."), at 23 (Durst's attorney requested that the Court "recommend that the Bureau of Prisons designate [Durst] to Fairton, New Jersey" because, as Durst explained, "my family can visit there quite easily and the inmates who I have become friendly with, all suggest that would be a place to serve my time.") Upon release, Durst returned to Texas to serve the term of parole for his Texas state charges and, concurrently, mandatory supervised release for his federal charges. (See id. at 14 (Durst's attorney explained that "Mr. Durst will be on what's called parole in Texas, when he is released from the custodial portion of his sentence [in Fairton]."); 15 (Assistant United States Attorney requested that, pursuant to Durst's plea agreement, "the supervised release time of two

---

[2] On November 11, 2003, following a seven-week jury trial in the Galveston State District Court, Durst was acquitted of all murder charges involving Morris Black.

5

years [for Durst's federal conviction] run concurrent with the supervised release [for Durst's state conviction] in Galveston, Texas.") He is required to remain in Texas, under supervision, until November 29, 2006.

While the parties dispute whether Durst maintained bank accounts in Texas, (Def. Mem. at 11 n.8; Pl. Mem. at 11), it appears that Durst transacted the "vast majority" of his personal financial business in New York until his November 2001 arrest. (See Def. Mem. at 11.) Virtually all of Durst's banking, securities, and other accounts are located with New York institutions. (See Durst Tr. at 17-18.) Durst maintains other professional connections in New York, where his accountants, and many of his attorneys and physicians, are located. (See Transcript of the Deposition of Anton Weiss, dated March 21, 2005 ("Weiss Tr."), at 8-9; Durst Tr. at 45, 145-47; Moerdler Decl. Ex. J. at 2088-89.) In 1998 and 1999, Durst filed federal tax returns giving a Texas home address. From 2000 to 2003, Durst filed federal tax returns giving a New York home address. (See Moerdler Decl. Ex. R.) From 1998 to 2003, Durst filed New York State tax returns, but filed each year as a non-resident (i.e., as a resident of Texas). (Id.)

New York Surrogate's Court Proceedings

On November 16, 2004, Defendants (in their capacity as trustees) filed an action seeking an accounting of the trusts in the New York Surrogate's Court in Westchester County with respect to the May 1962 Trust. On January 21, 2005, they filed a parallel proceeding in the same court with respect to the December 1962 Trust. (Def. Mem. at 3.) The Surrogate's Court proceedings "seek to settle the accounts of the Trusts and to discharge the trustees of any and all liability with respect to their administration of the Trusts," (Id.), and include "as parties Robert Durst and all twelve remaining grandchildren of Seymour B. Durst's father, Joseph Durst, who are each contingent beneficiaries under the Trusts." (Id. at 3-4.) Extensive discovery has taken place in the Surrogate's Court proceedings, including written discovery, depositions, and the production of over 50,000

6

pages of documents. (Id. at 4.) Judge Anthony A. Scarpino, Jr. has, among other things, appointed a guardian ad litem for Durst (apparently because Durst was incarcerated), and issued several discovery orders. The Trustees have filed several motions seeking, among other things, protective orders and to disqualify Durst's guardian ad litem, to which Durst has responded. (See Moerdler Decl. Exs. D, E; see also In re Seymour B. Durst, No. 3156/04, New York Surrogate's Court in Westchester County.)

### III. Legal Standard

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. U.S., 201 F.3d 110, 113 (2d Cir. 2000). On a motion to dismiss under Rule 12(b)(1), a court may refer to evidence outside of the pleadings, such as affidavits and documentary exhibits. See Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000) (citing Cargill Int'l S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1019 (2d Cir. 1993)).

In order "to effect a change of one's legal domicil[e], two things are indispensable: First, residence in a new domicil[e]; and, second, the intention to remain there. . . . Both are alike necessary. Either without the other is insufficient." Sun Printing & Publishing Association v. Edwards, 194 U.S. 377, 383 (1904); see also Linardos, 157 F.3d at 948. A party's domicile is "presumed to continue" until it is superseded by a new domicile. Gutierrez v. Fox, 141 F.3d 425, 427 (2d Cir. 1998).

Where state and federal courts have concurrent jurisdiction, abstention may be appropriate under "extraordinary circumstances" for reasons of "wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition." Colorado River Water Conservation Dist. v. U.S., 424 U.S. 800, 817 (1976); see De Cisneros v. Younger, 871 F.2d 305, 308 (2d Cir. 1989); see also Telesco v. Telesco Fuel & Masons' Materials, Inc., 765 F.2d 356 (2d

7

Cir. 1985) (abstention is appropriate where, "in its essential elements the same cause of action, regardless of theory or pleadings, is asserted in both courts" and "the federal action does in fact duplicate the state litigation.").

## IV. Analysis

### Jurisdiction

Defendants argue that "this action should be dismissed for lack of subject matter jurisdiction because diversity of citizenship does not exist," (Def. Mem. at 1), in that Durst "never relocated to Texas with the intent to remain there indefinitely," (Id. at 10), and that "Durst embraced a transient lifestyle, with Texas as merely one stop during his relentless travels across the country." (Id. at 20.) Defendants emphasize, inter alia, that (1) Durst's wife lives in New York, (2) Durst owned and maintained a residence in New York (i.e., the Rector Place apartment) from 1997 until after he was arrested in November 2001 to which he returned often, and (3) Durst used a New York forwarding address beginning in 1994. (See id. at 22-23; Robichaud Aff. Ex. 6.) Defendants also point to the fact that, when Durst was arrested on November 30, 2001, Durst "did not even maintain a residence in Texas," and that when Durst was arrested on November 30, 2001, "he told the arresting officer that he lived at 377 Rector Place in New York." (Id. 17, 22.)

Durst responds that "Defendants' arguments amount to nothing more than an indictment of a wealthy individual's lifestyle," and that "the inescapable conclusion is that after retiring from the family business, Durst sold his spacious Greene Street home, left New York in 1998 and established a new domicile in Dallas, Texas." (Pl. Mem. at 2, 16.) Durst argues, among other things, that (1) Durst "was not a New York domiciliary based on marriage to a New York domiciliary," (2) "Durst's Rector Place apartment was never intended to be and never was Durst's 'home,' but merely a 'pied-a-terre' for Durst," and (3) if Durst truly were a New York domiciliary, he "would not have had any reason to engage the services" of a mail-forwarding service. (Id. at 7, 19.) Durst

8

also contends that he filed New York State tax returns as a Texas resident and that his "use of his Texas home address did not 'save' him any money." (Id. at 16.) Durst also emphasizes that he "has chosen to return to Texas, not New York, after his present incarceration." (Id. at 13.)

"The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $ 75,000, exclusive of interest and costs, and is between . . . citizens of different States." 28 U.S.C. § 1332(a)(1). Diversity jurisdiction exists only when "all adverse parties to a litigation are completely diverse in their citizenships." Herrick Co. v. SCS Commc'ns, Inc., 251 F.3d 315, 322 (2d Cir. 2001). The existence of federal diversity jurisdiction "is determined by examining the citizenship of the parties at the time the action is commenced." Linardos v. Fortuna, 157 F.3d 945, 947 (2d Cir. 1998) (quotation omitted). "An individual's citizenship . . . is determined by his domicile" which is that place "where a person has his true and fixed home and principal establishment, and to which, whenever he is absent he has the intention of returning." Palazzo v. Corio, 232 F.3d 38, 42 (2d Cir. 2000) (citation omitted). "A party alleging that there has been a change of domicile has the burden of proving . . . [change in domicile] by clear and convincing evidence." Id. (quoting Katz v. Goodyear Tire & Rubber Co., 737 F.2d 238, 243-44 (2d Cir. 1984)).

Where there is evidence "indicating the party has more than one residence, or the residence is unclear, the court should focus on the intent of the party." Nat'l Artists Mgmt. Co. v. Weaving, 769 F. Supp. 1224, 1227 (S.D.N.Y. 1991). "In ascertaining the intent of the party, that party's entire course of conduct may be taken into account. The party's own statements concerning his intentions are relevant, but they are of slight weight when they come into conflict with other facts that tend to disclose a contrary intent." Bevilaqua v. Bernstein, 642 F. Supp. 1072, 1074 (S.D.N.Y. 1986); see also Brignoli v. Balch, Hardy & Scheinman, Inc., 696 F. Supp. 37, 41 (S.D.N.Y. 1988). "Although intent is crucial to domicile, mere subjective statements of affiliation with a particular

9

state or of an intent to make it one's home, of course cannot suffice for a finding of state citizenship if such statements are belied by objective indicia of actual residence and intent." Willis v. Westin Hotel Co., 651 F. Supp. 598, 601 (S.D.N.Y. 1986). The Court must determine Durst's domicile on November 30, 2001, when Durst was arrested and incarcerated in Galveston, Texas.

Durst has not met his burden of proof to show that he changed his domicile to Texas from New York between 1998 and November 2001 by "clear and convincing evidence." See Palazzo, 232 F.3d at 42. While Durst "embraced a transient lifestyle," and acquired many properties across the country, (see Def. Mem. at 20), New York appears to have remained "the place where [Durst] has his true fixed home and principal establishment, and to which, whenever his is absent, he has the intention of returning." Palazzo, 232 F.3d at 42; (see Durst Tr. at 67 (admitting that, in the year prior to his arrest, Durst returned to New York "at least 50" times); Charatan Tr. at 60 (noting that Durst "always came back, he always came back to see me."); see also Calendar and Timetable, attached as an appendix to Def. Mem. (showing that Durst spent time in New York almost every month between April 1998 and April 2001).)

Taking Durst's entire course of conduct into account, many factors indicate that Durst is a New York domiciliary. See Bevilaqua, 642 F. Supp. at 1074. First, Durst maintained his Rector Place apartment from May 1997 until May 2002 and visited there often, staying a "couple of months a year." (Durst Tr. at 12.) Although Durst characterizes the Rector Place apartment as "essentially . . . a closet," (Def. Mem. at 7), Durst maintained electricity and cable accounts in the apartment and paid all common charges until its sale in May 2002. (Pl. Mem. at 21.) Durst also engaged a New York mail-forwarding service that provided him with a New York mailing address, explaining that he "spent a minority of [his] time in Texas . . . and [he] had this arrangement [with the mail forwarding service] in New York to forward any mail to [him] wherever [he] was going to be." (Durst Tr. at 135.)

10

Second, Durst's apartments in Texas were all rentals, i.e., less permanent in nature than his Rector Place apartment which he purchased in 1997 and continued to own until 2002. While Durst correctly argues that "a permanent home can be established either by ownership or rental," (see Def. Mem. at 6 (citing Reynolds v. Wohl, 332 F. Supp. 2d 653 (S.D.N.Y. 2004)), the evidence also establishes that Durst purchased residences in many states in the years preceding his arrest, except for Texas and Louisiana. (See Def. Mem. at 7-8; Moerdler Decl. Ex. J. at 1698-1700, 3487-95, 3581-90, 8093.) In fact, with the exception of the New Orleans apartment Durst rented in March 2001 posing as "Diane Wynn," Durst's Texas apartments were the only residences Durst did not purchase. See Nat'l Artists, 769 F. Supp. at 1228 (listing as relevant factors "whether the person owns or rents his place of residence" and "the nature of the residence (i.e., how permanent the living arrangement appears).").

Third, Durst's wife lives in New York. While Durst and Ms. Charatan may be "separated in fact," (Pl. Mem. at 20), the couple are not legally separated. See Nat'l Artists, 769 F. Supp. at 1228 ("the residence of a married person's spouse and children (if the couple has not separated) is given considerable weight").

Fourth, Durst conducts a substantial amount of his personal financial dealings with New York institutions, and his bank and investment accounts are almost all located in New York. (See Def. Mem. at 22); Gindi v. Silverstein, Nos. 93 Civ. 8679, 8680, 1995 WL 347397, at *1 (S.D.N.Y. June 8, 1995) (New York domicile found where "principal sources of income and his business activities are located in New York, as are his bank accounts."). And, Durst maintained strong professional contacts with accountants, attorneys and doctors in New York. (See Weiss Tr. at 8-9; Durst Tr. at 45, 145-47; Moerdler Decl. Ex. J. at 2088-89.)

Fifth, Durst's argument that he is not a New York domiciliary because he filed New York State taxes as a Texas resident is unpersuasive, in part, because Durst attempted to (and did) realize

11

substantial savings by filing New York income tax forms as a non-resident. (See Pl. Mem. at 15-16.) Durst even asked his accountant to prepare "alternate [state tax] projections assuming that [Durst] were either a resident of New York City, Connecticut, or California," because Durst "wanted to know what [his] savings were by being in Texas." (Def. Mem. at 24; see Durst Tr. at 138.) See Galva Foundry Co. v. Heiden, 924 F.2d 729, 730 (7th Cir. 1991) (finding that defendant was an Illinois domiciliary, even though he "had registered to vote in Florida, had taken out a Florida driver's license, . . . and had listed his Florida address as his permanent address on both his federal and Illinois income tax returns" because "he did all these things for tax purposes").

Sixth, that Durst registered to vote in Texas in 2000 or held a Texas driver's license beginning in 1998, by themselves, are not enough to establish that Durst was a Texas domiciliary. See Galva, 924 F.2d at 730 (rejecting voting or driver's license as sole evidence of changed domicile because, otherwise, parties could "opt in or out of federal diversity jurisdiction" between multiple residences); see also Chevalier v. USA Express Moving & Storage Inc., No. 03 Civ. 9059, 2004 U.S. Dist. LEXIS 9990, at *9 (S.D.N.Y. June 2, 2004) ("the surrender of a license by itself shows no intent to remain in the state to which the license was surrendered").

Finally, despite Durst's contention that he "was free to designate any state in which to serve parole . . . [and] chose Texas," (Pl. Mem. at 13), Durst is required by Rule 3.101 of the Insterstate Commission for Adult Supervision Rules to return to Texas for his parole and is only eligible for a transfer of supervision to another state at Texas' discretion. (See Fed. Sentencing Tr. at 22 ("That upon release from imprisonment, [Durst] shall be placed on supervised release for a term of two years, to be served concurrently and coterminously with the state parole or probation [in Texas].").) And, Durst specifically requested that he be permitted to serve his federal prison sentence in New Jersey, so that his "family [could] visit there quite easily." (Id. at 23.)

12

These factors, when taken together, certainly do not provide clear and convincing evidence that Durst changed his domicile from New York to Texas. See Gutierrez, 141 F.3d at 427-28; Chevalier, 2004 U.S. Dist. LEXIS at **5-7.

**Abstention**

Assuming arguendo that there were diversity and the Court could exercise subject matter jurisdiction over this case, Defendants argue that the Court "should decline to exercise it in favor of the Surrogate's Court Proceedings." (Def. Mem. at 26.) Because "the Surrogate's Court Proceedings encompass all of the issues and the parties currently before this Court," abstention "would avoid multiple proceedings, duplicative and burdensome parallel discovery, and the possibility of inconsistent results." (Id.)

Durst responds that "this Court should continue to exercise jurisdiction over this action" because Durst alleges "garden-variety breaches of contract, breaches of fiduciary duty, breaches of the duty of good faith and fair dealing, and unjust enrichment" which "are not areas of the law that are obscure to this Court." (Pl. Mem. at 23.) Durst also argues that, if this Court decides to abstain, "such abstention should be 'conditional' and should require that Defendants agree . . . that all claims and remedies encompassed by this action can be properly entertained by the Surrogate's Court." (Id. at 23-24.)

Although "no one [Colorado River] factor is necessarily determinative," Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 16 (1983), "in determining whether [abstention is appropriate], the court should consider (1) whether the controversy involves a res over which one of the courts has assumed jurisdiction, (2) whether the federal forum is less inconvenient than the other for the parties, (3) whether staying or dismissing the federal action will avoid piecemeal litigation, (4) the order in which the actions were filed, and whether proceedings have advanced more in one forum than in the other, (5) whether federal law provides the rule of decision, and (6)

13

whether the state procedures are adequate to protect the plaintiff's federal rights." Woodford v. Cmty Action Agency of Greene County, 239 F.3d 517, 522 (2d Cir. 2001); see also Vill. of Westfield v. Welch's, 170 F.3d 116, 121 (2d Cir. 1999).

Here, analysis of these factors leads to the conclusion that Colorado River abstention is appropriate in this case. See De Cisneros, 871 F.2d at 308.

### 1. Assumption of Jurisdiction Over a Res

The Surrogate's Court has assumed jurisdiction over the trusts at issue, as part of Seymour Durst's estate. The Surrogate's Court has, among other things, appointed a guardian ad litem for Durst, and issued discovery orders. (See Moerdler Decl. Exs. D, E; see also In re Seymour B. Durst, No. 3156/04, New York Surrogate's Court in Westchester County.) The Surrogate's Court docket indicates that several motions have been filed in the proceedings, and it appears that Durst has participated actively by filing briefs in opposition to those motions. (Id.) This factor supports abstention.

### 2. Inconvenience of the Federal Forum

Because the federal forum is equally convenient to the Surrogate's Court, this factor "point[s] toward exercise of federal jurisdiction." See De Cisneros, 871 F.2d at 307.

### 3. Avoidance of Piecemeal Litigation

Abstention would prevent piecemeal litigation, because Durst's complaints against Defendants are already before the Surrogate's Court. See Arkwright-Boston Mfr. Mut. Ins. Co. v. City of N.Y., 762 F.2d 205, 211(2d Cir. 1985) (trying identical issues in more than one forum would "waste judicial resources and invite duplicitous effort."). The efficient resolution of Durst's complaints is best left to the Surrogate's Court, which are much further along than the proceedings in this Court. See De Cisneros, 871 F.2d 305, 308 (2d Cir. 1989) (abstaining because, among other things, the state proceedings were "more comprehensive than the federal proceedings"); Arkwright-

14

Boston, 762 F.2d at 211 ("Consolidation in the state court could lead to more efficient fact-finding and more reasoned decision-making.").

### 4. Order in Which Jurisdiction was Obtained

The instant case was filed on August 30, 2004, before Defendants' filed their actions in the Surrogate's Court on November 16, 2004 and January 21, 2005. However, "as for the order in which the concurrent tribunals obtained jurisdiction, such is not to be measured 'exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions.'" Warzala v. St. Bonaventure Univ., No. 98 Civ. 0232, 1999 U.S. Dist. LEXIS 5132, at *12 (W.D.N.Y. Mar. 26, 1999) (citing Cone, 460 U.S. at 21.). In the instant case, as noted above, the Surrogate's Court proceedings are further along than those in this Court. See Am. Disposal Servs., Inc. v. O'Brien, 839 F.2d 84, 88 (2d Cir. 1988) (abstaining where "the federal court proceedings barely have addressed the underlying claims, and have instead concentrated on the propriety of bringing suit in federal court at all.").

### 5. State or Federal Rule of Decision

Durst's complaints relate principally to state law issues (i.e., trusts and estates laws), which the Surrogate's Court is better equipped to adjudicate. See Markham v. Allen, 326 U.S. 490, 494 (1946) ("a federal court has no jurisdiction to probate a will or administer an estate"); Phillips, Nizer, Benjamin, Krim & Ballon v. Rosenstiel, 490 F.2d 509, 516 (2d Cir. 1973) (questions of trust law "raise issues in which the states have an especially strong interest and a well-developed competence for dealing with them.").

### 6. Adequate Protection of Plaintiff's Rights

The Surrogate's Court is able to entertain all of Durst's claims. See N.Y. S.C.P.A. § 201(3) (explaining that Surrogate's Court "shall continue to exercise full and complete general jurisdiction in law and equity to administer justice in all matters relating to estates and the affairs of

15

decedents."); Moser v. Pollin, 294 F.3d 335, 344 (2d Cir. 2002) (Surrogate's Court has broad jurisdiction to determine "any and all matters affecting the estate of a decedent").

Taken together, the Colorado River factors render abstention appropriate in this case. See De Cisneros, 871 F.2d at 308; Bull & Bear Group, Inc. v. Fuller, 786 F. Supp. 388, 394 (S.D.N.Y. 1992); see also Arkwright-Boston, 762 F.2d at 211 ("as in Colorado River, the danger of piecemeal litigation is the paramount consideration . . . [T]he avoidance of piecemeal litigation is best served by leaving these suits in the state court.").

## V. Conclusion

For the reasons stated above, Defendants' motion to dismiss for lack of diversity jurisdiction is granted with prejudice. The Clerk of the Court is respectfully requested to close this case.

Dated: New York, New York
December 7, 2005

*RMB*

_____
**Richard M. Berman, U.S.D.J.**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12-7-05
```

16