UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CAROL BAMONTE, *as Administrator of the Estates of Kathleen Durst, et al.*,

                                        Plaintiffs,

    v.

DEBRAH LEE CHARATAN, *as the Nominated Executor of the Estate of Robert Durst*,

                                        Defendant.

No. 22-CV-795 (KMK)

OPINION & ORDER

---

Appearances:

Robert Abrams, Esq.
Raju Sundaran, Esq.
Brian T. McCarthy, Esq
Abrams, Fensterman, LLP.
New Hyde Park, Lake Success, and Brooklyn, NY
*Counsel for Plaintiffs*

Matthew C. Capozzoli, Esq.
Robinson Brog Leinwand Greene Genovese & Gluck P.C.
New York, NY
*Counsel for Plaintiffs*

Michael S. Hiller, Esq.
Hiller, P.C.
New York, NY
*Counsel for Defendant*

Scott W. Epstein, Esq.
Jeffrey A. Antin, Esq.
Antin, Ehrlich & Epstein, P.C.
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

Carol Bamonte ("Bamonte"), as Administrator of the Estate of Kathleen McCormack

Durst ("Kathie"), James McCormack, Virginia McKeon, and Mary Hughes, as Co-

Administrators of the Estate of Anne C. McCormack, a Distributee of the Estate of Kathie Durst ("Plaintiffs"), bring this Action for wrongful death seeking monetary damages against Debrah Lee Charatan ("Charatan," or "Defendant"), in her capacity as the nominated executor of the Estate of Robert Durst ("Durst").  (*See generally*. Compl. (Dkt. No. 1).)[1]  Before the Court is Defendant's Motion To Dismiss the Complaint (the "Motion") pursuant to Federal Rule of Civil Procedure 12(b)(6).  (*See* Dec. in Support of Mot. (Dkt. No. 51).)

For the reasons stated herein, the Motion is denied.

## I.  Background

### A.  Factual Background

Plaintiffs allege that Durst "murdered Kathie in South Salem, New York on January 31, 1982."  (Compl. ¶ 19.)  "In a Decision and Order entered on May 24, 2018, the Supreme Court of the State of New York, Appellate Division, First Department held that Kathie's date of death is January 31, 1982."  (*Id.* ¶ 20.)  "At the time of her death, Kathie was 29 years old and in good health."  (*Id.* ¶ 21.)

On March 22, 2019, the administrator of Kathie's Estate commenced an action against Durst in the Supreme Court, New York County.  (*Id.* ¶ 25.)  "On August 6, 2019, the [c]ourt in *Bamonte v. Durst* entered an Order dismissing [] Kathie's Estate's cause of action for wrongful death 'without prejudice to refiling in the event that a criminal action is commenced against Robert Durst pertaining to the death of Kathleen Durst.'"  (*Id.* ¶ 26.)

On October 19, 2021, a felony complaint was filed with the Town Court of the Town of Lewisboro, New York charging Durst "with Murder in the Second Degree in violation of PL

---

[1] The Court notes that Bamonte passed away on January 28, 2023, and Plaintiffs are appointing Bamonte's three remaining siblings, co-Plaintiffs in this action, as the Administrators of Kathie's estate.  (*See* Dkt. No. 77.)

2

§ 125.25(a) for the intentional killing of Kathie on January 31, 1982, at or near 62 Hoyt Street, South Salem, New York." (*Id.* ¶¶ 27–28.) "On November 1, 2021, the Westchester District Attorney announced a grand jury in Westchester County, New York had indicted [Durst] for the murder of Kathie." (*Id.* ¶¶ 30.)

Durst died on January 10, 2022, in Stockton California, while an inmate at the California Health Care Facility, serving a life sentence for murdering another individual. (*Id.* ¶¶ 14–15.) Prior to his incarceration, Durst resided at 2520 Robinhood Street #1405, Houston, Texas 77005. (*Id.* ¶ 16.) Defendant Charatan, "is the nominated Executor of Robert Durst's Estate" ("Estate") and "filed a proceeding to probate his Last Will and Testament on January 14, 2022, in Probate Court, Harris County, Texas." (*Id.* ¶ 17.) "The Estate of [] Durst is domiciled in the State of Texas." (*Id.* ¶ 18.)

"While Kathie was still listed as a missing person, the Surrogate's Court of the State of New York, County of New York entered an Order establishing an absentee estate for Kathie." (*Id.* ¶ 4.) Kathie's mother, Anne C. McCormack, was a distributee of Kathie's estate until Anne's death in 2016. (*Id.* ¶¶ 5–6.) Bamonte was a citizen of the State of New York and resided in Suffolk County, New York and was the Executor of Anne C. McCormack's Estate and the Administrator of Kathie's Estate, however Bamonte passed away on January 28, 2023. (*Id.* ¶¶ 8–9; Dkt. No. 77.) Plaintiffs James McCormack, a citizen of New Jersey, Virginia McKeon, a citizen of Massachusetts, and Mary Hughes, a citizen of New York, are now the Co-Administrators of Anne McCormack's Estate and have applied to replace Bamonte as the Administrators of Kathie's Estate. (*Id.* ¶¶ 10–13.)

"Kathie was and is survived by distributees that have suffered a pecuniary loss as a result of Kathie's death." (*Id.* ¶ 23.) "Plaintiffs, who have been appointed as Administrator of Kathie's

estate and Co-Administrators of the Estate of Anne C. McCormack, and Anne C. McCormack, have also suffered economic and special damages as a result of Kathie's death." (*Id.* ¶ 24.) Plaintiffs' "underlying claim is in excess of $75,000." (*Id.* ¶ 1.)

### B. Procedural Background

Plaintiffs filed this Action alleging wrongful death on January 31, 2022. (*See generally* Compl.) On May 10, 2022, this Court denied Plaintiffs' request for a preliminary injunction. (Dkt. No. 49.) Defendant filed the instant Motion on June 9, 2022. (*See* Mem. of Law in Supp. of Mot. ("Def.'s Mem.") (Dkt. No. 52).) Plaintiffs filed their Opposition on July 11, 2022. (*See* Mem. of Law for Reply to Mot. to Dismiss ("Pls.' Mem.") (Dkt. No. 53).) Defendant filed a Reply on August 3, 2022. (*See* Reply to Mot. ("Def.'s Reply Mem.") (Dkt. No. 58).) On December 12, 2022, this Court ordered additional briefing regarding the relation of the abatement doctrine to pre-conviction criminal actions. (Dkt. No. 71.) On January 4, 2023, the Parties submitted additional briefing. (*See* Supplemental Mems. of Law ("Pls.' Supp. Mem"; "Def.'s Supp. Mem") (Dkt. Nos. 74–75).)

## II. Discussion

### A. Standard of Review

The Supreme Court has held that while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions

devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted).   Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570.   However, if a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed."   *Id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . .  be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.   But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).   Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to

matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

### B.  Analysis

#### 1.  Jurisdiction

At the preliminary injunction hearing, there was question as to this Court's jurisdiction, specifically as it relates to the probate exception. (*See* Dkt. No. 65.)   As it is always a Court's duty to ensure it has jurisdiction, the Court addresses its jurisdiction over the instant action.

##### a.  Diversity Jurisdiction

A federal district court may exercise subject matter jurisdiction over a cause of action only if there exists either: (1) federal question jurisdiction, which requires a claim "arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331; or (2) diversity jurisdiction, which requires diversity of citizenship between the plaintiff and defendant and the amount in controversy exceeds "the sum or value of $75,000, exclusive of interest and costs," 28 U.S.C. § 1332(a).  "These jurisdictional grants . . . [e]ach serve[ ] a distinct purpose: [f]ederal-question jurisdiction affords parties a federal forum in which to vindicate federal rights, whereas diversity jurisdiction provides a neutral forum for parties from different States." *Home Depot U. S. A., Inc. v. Jackson*, 139 S. Ct. 1743, 1746 (2019) (quotation marks omitted) (quoting *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005)).

For diversity jurisdiction to exist, the cause of action must be between: (1) "citizens of different States;" (2) "citizens of a State and citizens or subjects of a foreign state;" (3) "citizens of different States and in which citizens or subjects of a foreign state are additional parties;" or (4) "a foreign state. . . as plaintiff and citizens of a State or different State."  28 U.S.C. § 1332(a).

When an action involves more than one plaintiff or one defendant, "diversity jurisdiction is available only when all adverse parties to a litigation are completely diverse in their citizenships." *Herrick Co. v. SCS Commc'ns, Inc.*, 251 F.3d 315, 322 (2d Cir. 2001) (citation and quotation marks omitted); *see also Exxon Mobil,* 545 U.S. at 553 ("In a case with multiple plaintiffs and multiple defendants, the presence in the action of a single plaintiff from the same State as a single defendant deprives the district court of original diversity jurisdiction over the entire action.").

"[F]ailure of subject matter jurisdiction is not waivable." *Lyndonville Sav. Bank & Tr. Co. v. Lussier*, 211 F.3d 697, 700 (2d Cir. 2000). Therefore, an action must be dismissed if subject matter jurisdiction is found wanting. *See* Fed. R. Civ. P. 12(h)(3); *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.À.R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015) ("A district court properly dismisses an action . . . for lack of subject matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate it.") (quotation marks omitted) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)); *Lyndonville*, 211 F.3d at 700–01 ("If subject matter jurisdiction is lacking, the action must be dismissed."); *Manway Constr. Co. v. Hous. Auth. of Hartford*, 711 F.2d 501, 503 (2d Cir. 1983) ("It is common ground that in our federal system of limited jurisdiction any party or the court sua sponte, at any stage of the proceedings, may raise the question of whether the court has subject matter jurisdiction; and, if it does not, dismissal is mandatory.").

Here, where Plaintiffs raise no claims under the Constitution, laws, or treaties of the United States, "it is unquestioned that the only source of federal subject matter jurisdiction [in this Action] is diversity of citizenship pursuant to 28 U.S.C. § 1332." *Frydman v. Endurance Am. Ins. Co.*, No. 22-CV-5558, 2022 WL 4124794, at *1 (S.D.N.Y. Sept. 9, 2022) (citing

7

*Herrick*, 251 F.3d at 322).  "A prisoner is presumed to be citizen of the state where he was domiciled before he was incarcerated."  *Philippeaux v. Entin*, No. 19-CV-2205, 2020 WL 1878114, at *2 (S.D.N.Y. Jan. 13, 2020), *report and recommendation adopted*, No. 19-CV-2205, 2020 WL 563903 (S.D.N.Y. Feb. 5, 2020); *Braten v. Kaplan*, No. 07-CV-8498, 2009 WL 614657, at *4 (S.D.N.Y. Mar. 10, 2009) ("It is well-settled that a prisoner retains his pre-incarceration domicile."), *aff'd*, 406 F. App'x 516 (2d Cir. 2011).  Accordingly, Durst is deemed a citizen of Texas, his domicile prior to his incarceration.  (Compl. ¶ 16.)  "[T]he legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent."  28 U.S.C. § 1332(c)(2)).  Therefore, federal law and the precedent interpreting it render Defendant a citizen of Texas in her capacity as the Estate's representative.  *See Truck-A-Tune, Inc. v. Ré*, 23 F.3d 60, 62 (2d Cir. 1994) ("[R]epresentatives of . . . [an] [e]state are deemed to have the citizenship of the decedent . . . .").  Plaintiffs are citizens of New York, New Jersey, and Massachusetts.  (Compl. ¶¶ 8–12.)  Therefore, all Plaintiffs are diverse from Defendant.  Lastly, Plaintiffs' claim exceeds $75,000.  (*Id.* ¶ 1.)

"When sitting in diversity jurisdiction and determining New York state law claims, [the courts] must apply the law of New York."  *Ray v. Ray*, 22 F.4th 69, 72 (2d Cir. 2021) (affirming dismissal of complaint based upon statute of limitations under New York law) (citation omitted); *see also Vincent v. Money Store*, 915 F. Supp. 2d 553, 562 (S.D.N.Y. 2013) ("A federal court sitting in diversity applies the forum state's statute of limitations provisions, as well as any provisions that govern the tolling of the statute of limitations.").  The role of a federal court sitting in diversity is to "carefully predict how the state's highest court would resolve any uncertainties in state law, giving the fullest weight to pronouncements of the state's highest court."  *Valentini v. Grp. Health Inc.*, No. 20-CV-9526, 2021 WL 2444649, at *6 (S.D.N.Y. June

8

15, 2021) (quotation marks omitted) (quoting *Runner v. N.Y. Stock Exch., Inc.*, 568 F.3d 383,

386 (2d Cir. 2009)).

b.  Probate Exception

"The 'probate exception' is an historical aspect of federal jurisdiction that holds 'probate

matters' are excepted from the scope of federal diversity jurisdiction." *Lefkowitz v. Bank of N.Y.*,

528 F.3d 102, 105 (2d Cir. 2007) (citing *Marshall v. Marshall*, 547 U.S. 293, 307–09 (2006)).  In

short, "the probate exception 'reserves to state probate courts the probate or annulment of a will

and the administration of a decedent's estate; it also precludes federal courts from endeavoring to

dispose of property that is in the custody of a state probate court.'"  *Id.* (quoting *Marshall*, 547

U.S. at 311–12).  Importantly, however, the exception does not "bar federal courts from

adjudicating matters outside those confines and otherwise within federal jurisdiction."  *Id.*

(quoting *Marshall*, 547 U.S. at 312).

Notwithstanding prior precedent—including in the Second Circuit—that the probate

exception ought to be "interpreted . . . broadly . . . [,] [i]n *Marshall*, the Supreme Court

unanimously held that the probate exception is narrow, and should not be used as an excuse to

decline to exercise jurisdiction over actions merely because they involve a 'probate related

matter.'"  *Marcus v. Quattrocchi*, 715 F. Supp. 2d 524, 531 (S.D.N.Y. 2010) (quoting *Marshall*,

547 U.S. 299–300); *see also Lefkowitz*, 528 F.3d at 105 ("Before *Marshall*, most federal courts,

including ours, had interpreted the probate exception more broadly than the Supreme Court has

now defined it.").

After *Marshall*, "[d]etermining whether [a] case falls within the probate exception

involves a two-part inquiry: first, whether the action requires 'the probate or annulment of a will

[or] the administration of a decedent's estate'; and second, whether the action requires the court

9

'to dispose of property that is in the custody of a state probate court.'" *Yien-Koo King v. Wang*, No. 14-CV-7694, 2018 WL 1478044, at *7 (S.D.N.Y. Mar. 26, 2018) (quoting *Groman v. Cola*, No. 07-CV-2635, 2007 WL 3340922, at *5 (S.D.N.Y. Nov. 7, 2007)); *see also Lefkowitz*, 528 F.3d at 106 ("Following *Marshall* . . . so long as a plaintiff is not seeking to have the federal court administer a probate matter or exercise control over a res in the custody of a state court, if jurisdiction otherwise lies, then the federal court may, indeed must, exercise [jurisdiction]."). A federal court may properly "exercise its jurisdiction to adjudicate rights in property in the custody of a state court where the final judgment does not undertake to interfere with the state court's possession save to the extent that the state court is bound by the judgment to recognize the right adjudicated by the federal court." *Lefkowitz*, 528 F.3d at 108 (alterations omitted) (quoting *Marshall*, 547 U.S. at 309). Therefore, while federal courts cannot grant injunctive relief requiring probate courts to perform specific actions with regard to the assets of an estate, federal courts can exercise diversity jurisdiction over money judgment claims brought against estates after probate proceedings have begun. *See U.S. Specialty Ins. Co. v. A–Val Architectural Metal Corp.*, No. 15-CV-760, 2015 WL 3948115, at *6 (S.D.N.Y. June 29, 2015) (holding that the court could not grant injunctive relief requiring the probate court to perform particular actions as to funds, but holding that jurisdiction over a money judgment claim existed because "adjudicating these claims only requires the [c]ourt to determine whether [the plaintiff] has a valid claim against the [estate]—the [c]ourt would not (and could not) determine any issues of claim priority, and would not interfere with the state court's possession of the [estate's] funds and property save to the extent that the state court is bound by the judgment to recognize the right adjudicated by this [c]ourt") (citation and quotation marks omitted); *see also Ashton v. Josephine Bay Paul & C. Michael Paul Found., Inc.*, 918 F.2d 1065, 1072 (2d Cir. 1990)

("Merely determining the rights to, as opposed to administering, assets is not proscribed by the probate exception."); *Wilmington Tr., Nat'l Ass'n v. Est. of McClendon*, 287 F. Supp. 3d 353, 368–69 (S.D.N.Y. 2018) (holding that the probate exception did not apply because once the court determined plaintiff's rights in the estate the probate court maintained "authority to evaluate how to balance those rights with, likely, other creditor claims and, ultimately, distribute the property under its control"). Here, where the Court is assessing a money judgment claim against an estate rather than demanding specific performance from that estate, diversity jurisdiction is proper. *See Lefkowitz*, 528 F.3d at 106 ("[W]here exercise of federal jurisdiction will result in a judgment that does not dispose of property in the custody of a state probate court, even though the judgment may be intertwined with and binding on those state proceedings, the federal courts retain their jurisdiction.").

### 2. Statute of Limitations

Under New York law, the statute of limitations for wrongful death is two years from the decedent's death. N.Y. EPTL § 5-4.1(1); *see also Est. of Capo v. Haquif*, No. 18-CV-10903, 2019 WL 2498369, at *4 (S.D.N.Y. May 31, 2019) (citing the statute as "the two-year wrongful death statute of limitations"). Plaintiffs do not assert their action is timely under this statute of limitations as Kathie's date of death was in 1982. (Compl. ¶ 20.) However, under Section 5-4.1(2) of the New York Estates, Powers and Trust Law ("EPTL"), an estate's personal representative is afforded at least one year after the termination of criminal proceedings to initiate proceedings against a defendant, even if the statute of limitations has otherwise expired. In full, the section provides that:

> Whenever it is shown that a criminal action has been commenced against the same defendant with respect to the event or occurrence from which a claim under this section arises, the personal representative of the decedent shall have at least one year from the termination of the criminal action as defined in section 1.20 of the

11

criminal procedure law in which to maintain an action, notwithstanding that the time in which to commence such action has already expired or has less than a year remaining.

EPTL § 5-4.1(2).

Pursuant to § 1.20 of the New York Criminal Procedure Law, a criminal action is deemed to have been commenced by the filing of an indictment, felony complaint, or other accusatory instrument. *See* N.Y. Crim. Proc. Law §§ 1.20(1), (17).  Under New York law, a criminal action terminates "with the imposition of sentence or some other final disposition in a criminal court of the last accusatory instrument filed in the case." *Morgenthau v. Basbus*, 890 N.Y.S.2d 43, 44 (App. Div. 2009) (quoting N.Y. Crim. Proc. Law § 1.20(16)).  Plaintiffs claim that the filing of a criminal complaint and the indictment against Durst in 2021 pertaining to Kathie's death constitute the commencement of a criminal action, allowing them to bring a wrongful death action against Durst's Estate under section 5-4.1(2) of the New York EPTL.  (Compl. ¶¶ 29–32.) In support of her Motion to Dismiss, Defendant argues that Durst's death abated the entire criminal proceeding against him *ab initio*, extinguishing any cause of action under section 5-4.1(2) of the New York EPTL.  (*See generally* Def.'s Mem.)  Plaintiffs contend that New York does not have an abatement *ab initio* doctrine, that the cases applying the doctrine are distinguishable, and that the language and/or legislative history of the New York EPTL clearly recognize that such a doctrine should not curtail the statute of limitation at issue.  (*See generally* Pls.' Mem.)

### a.  The Abatement Doctrine

Defendant's Motion points to a series of federal cases discussing the abatement doctrine. (Def.'s Mem. 7–9.)  In the federal courts, "when a convicted defendant dies while his direct appeal as of right is pending, his death abates not only the appeal but also all proceedings had in

the prosecution from its inception." *United States v. Libous*, 858 F.3d 64, 66 (2d Cir. 2017)

(quotation marks and citation omitted); *see also United States v. Christopher*, 273 F.3d 294, 297

(3d Cir. 2001) ("[T]he rule followed almost unanimously by the [federal] Courts of Appeals is

that a conviction abates on the death of the accused before his appeal has been decided."). In the

federal context, all charges "abate *ab initio*" meaning that charges are "not merely dismissed.

Instead, everything associated with the case is extinguished, leaving the defendant as if he had

never been indicted or convicted." *Libous*, 858 F.3d at 66 (quoting *United States v. Estate of

Parsons*, 367 F.3d 409, 413 (5th Cir. 2004). Plaintiffs and Defendant dispute whether New York

State law recognizes a similar doctrine of abatement *ab initio*. (*See generally* Def.'s Reply

Mem.; Pls.' Mem.)

Plaintiffs contend that "there is no New York Court of Appeals decision suggesting that

[] abatement *ab initio* is New York law." (Pls.' Mem. 6.) However, the New York Court of

Appeals has clearly articulated that a criminal defendant's death "during the pendency of a direct

appeal to the Appellate Division abates the appeal and all proceedings in the prosecution from its

inception." *People v. Matteson*, 551 N.E.2d 91, 91 (N.Y. 1989) (citing *People v. Mintz*, 229

N.E.2d 712, 713 (N.Y. 1967) (holding the Appellate Division correctly dismissed the appeal of a

defendant who died pending appeal because "the entire criminal prosecution [] abate[s] by

reason of [defendant's] death") (citation omitted)).[2] The phrase, "from its inception," used by

the New York Court of Appeals means "*ab initio*" in Latin, the phrase used by the Second

Circuit. *Faison v. Lewis*, 32 N.E.3d 400, 401 (N.Y. 2015) ("[V]oid ab initio, meaning a legal

nullity at its inception"); *Black's Law Dictionary* (11th ed. 2019) (defining "*ab initio*" as "from

---

[2] In both *Matteson* and *Mintz*, the defendant's judgment of conviction was vacated and
the underlying indictment dismissed. *See Matteson*, 551 N.E.2d at 91; *Mintz*, 229 N.E.2d at 713.

the beginning").  Indeed, other state courts have used such language interchangeably in this

context.  *See, e.g., State v. Al Mutory*, 581 S.W.3d 741, 743 (Tenn. 2019) ("The effect of

abatement *ab initio* 'is to stop all proceedings *ab initio* (from the beginning) and render the

defendant as if he or she had never been charged.'") (citing Timothy A. Razel, Note, *Dying to*

*Get Away with It: How the Abatement Doctrine Thwarts Justice & What Should Be Done*

*Instead*, 75 Fordham L. Rev. 2193, 2195 (2007)); *People v. Griffin*, 328 P.3d 91, 92 (Colo. 2014)

("Under the doctrine of abatement *ab initio*, a defendant's death abates not just the pending

appeal but all proceedings in the prosecution '*ab initio*,' or 'from the beginning.'") (citation

omitted); *State v. Burrell*, 837 N.W.2d 459, 462–63 (Minn. 2013) ("'Abatement' is defined as

the discontinuance of a legal proceeding 'for a reason unrelated to the merits of the claim.' '*Ab*

*initio*' means '[f]rom the beginning.'") (citation omitted); *People v. Robinson*, 719 N.E.2d 662,

663 (Ill. 1999) ("[W]hen a defendant dies while his direct appeal is pending before the appellate

court, all of the criminal proceedings abate *ab initio*, from their inception.").[3]

---

[3] Plaintiffs' argument that abatement *ab initio* is not New York law because, in many reported cases, the New York Court of Appeals "dismissed the deceased defendant's appeal without dismissing the underlying indictment" is unconvincing.  (Pls.' Mem. 6.)  The cases cited by Plaintiffs involve appeals of convictions which had already been reviewed by the Appellate Division.  *People v. Marin*, 670 N.E.2d 446, 446 (N.Y. 1996); *People v. Castro*, 647 N.E.2d 109, 109 (N.Y. 1994); *People v. Smith*, 575 N.E.2d 394, 394 (N.Y. 1991); *People v. Ortiz*, 567 N.E.2d 974, 974 (N.Y.1990); *People v. Coker*, 534 N.E.2d 317, 317 (N.Y. 1988); *People v. Ellis*, 525 N.E.2d 750, 750 (1988); *People v. Parker*, 522 N.E.2d 1063, 1063 (N.Y. 1988); *People v. Pacheco*, 490 N.E.2d 547, 547 (N.Y. 1986); *People v. Jackson*, 489 N.E.2d 1300, 1300 (N.Y. 1985); *People v. Darden*, 420 N.E.2d 99, 99 (1981); *People v. McMahon*, 392 N.E.2d 1258, 1258 (N.Y. 1979).  The only Court of Appeals case cited by Plaintiffs in support of this proposition that did not involve a decision from the Appellate Division before appeal to the New York Court of Appeals, *People v. Craig*, 585 N.E.2d 783 (N.Y. 1991), dealt with a conviction from a city court that was affirmed by a county court.  *Id.* at 784–85.  The doctrine of abatement as articulated by the New York Court of Appeals in *Matteson* specifies that abatement applies through the pendency of a *direct appeal*, accordingly, that the Court of Appeals did not order the dismissal of the underlying indictment in these cases does not indicate that New York does not employ abatement *ab initio*.  551 N.E.2d at 91.

The New York Court of Appeals clearly prescribes that the entirety of a prosecution abates when a defendant dies "*during the pendency of a direct appeal* to the Appellate Division." *Matteson*, 551 N.E.2d at 91 (emphasis added). This articulation of the abatement doctrine aligns with Federal case law—which applies abatement *ab initio* when a defendant dies after conviction while his appeal is pending. *Libous*, 858 F.3d at 66 ("[W]hen a *convicted defendant* dies while his *direct appeal as of right is pending*, his death abates not only the appeal but also all proceedings had in the prosecution from its inception.") (emphasis added) (citation omitted); *United States v. Volpendesto*, 755 F.3d 448, 452 (7th Cir. 2014) ("Because mootness occurs before the conviction can finally be confirmed, the longstanding and unanimous view of the lower federal courts [is] that the *death of an appellant during the pendency of his appeal of right from a criminal conviction* abates the entire course of the proceedings brought against him." (emphasis added) (citation omitted)); *Estate of Parsons*, 367 F.3d at 413 ("It is well established in this circuit that the *death of a criminal defendant pending an appeal* of his or her case abates, *ab initio*, the entire criminal proceeding." (emphasis added)); *Christopher*, 273 F.3d at 297

---

Plaintiffs' contention that the Kings County Supreme Court decision in *People v. Fevziekinici*, 743 N.Y.S.2d 651 (Sup. Ct. 2002) "also demonstrates that abatement *ab initio* is not the law in New York" fails for the same reason. (Pls.' Mem. 6.) The court in *Fevziekinici*, refused to abate a fine and judgment that had been imposed on a criminal defendant who died because the defendant "was accorded all his statutory and constitutional rights regarding appeal before he passed away." 743 N.Y.S.2d at 659. Because the defendant in *Fevziekinici* was afforded a decision by the Appellate Division and did not have an appeal pending, this case is distinguished from those New York cases applying the abatement doctrine before the direct appeal process is complete. *See, e.g., Matteson*, 551 N.E.2d at 91; *Mintz*, 229 N.E.2d at 713.

Plaintiffs' reliance on *Elm Realty, Inc. v. Off. of Rent Control*, 426 N.E.2d 175 (N.Y. 1981) is also misguided. Plaintiffs claim that the Court of Appeals in *Elm Realty* "vacated a fine imposed on the deceased defendant but did not vacate the indictment." (Pls.' Mem. 6.) However, that case involved a determination by the Office of Rent Control and an imposition of civil penalties, not a criminal indictment. *Elm Realty,* 426 N.E.2d at 176.

("[W]here a *convicted criminal defendant dies after filing an appropriate appeal*, the conviction will be abated and the case remanded to the [d]istrict [c]ourt with instructions to dismiss the indictment." (emphasis added)); *United States v. Oberlin*, 718 F.2d 894, 895 (9th Cir. 1983) ("*Death pending appeal of a criminal conviction* abates not only the appeal but all proceedings in the prosecution from its inception." (emphasis added)).

The New York Court of Appeals has explained that the application of the abatement doctrine when a defendant dies after conviction but before appeal is animated by concerns about the validity of convictions that have not been afforded appellate review. *Matteson,* 551 N.E.2d at 91 ("The death places a defendant beyond the court's power to enforce or reverse the judgment of conviction, thereby preventing effective appellate review of the validity of the conviction."); *Mintz*, 229 N.E.2d at 713 ("[S]ince [the appeal] cannot be heard, it can never be determined whether the judgment of conviction would stand, and this requires that the judgment of conviction be vacated."). A similar due process concern motivates abatement *ab initio* in the Second Circuit. *Libous*, 858 F.3d at 66 ("[T]he interests of justice ordinarily require that a defendant not stand convicted without resolution of the merits of an appeal.") (quotation marks omitted) (quoting *United States v. Wright*, 160 F.3d 905, 908 (2d Cir. 1998)). This rationale, which the Second Circuit has labeled the "finality rationale"—is "grounded in procedural due process concerns." *Id*.; *accord Volpendesto*, 755 F.3d at 453 ("[T]he state should not label one as guilty until he has exhausted his opportunity to appeal.") (quotation marks omitted); *United States v. Logal*, 106 F.3d 1547, 1552 (11th Cir. 1997) ("[A] fundamental principle of our jurisprudence from which the abatement principle is derived is that a criminal conviction is not final until resolution of the defendant's appeal as a matter of right."); *United States v. Pauline*, 625 F.2d 684, 685 (5th Cir. 1980) ("[W]hen . . . death has deprived the accused of his right to our

decision, the interests of justice ordinarily require that he not stand convicted without resolution of the merits of his appeal, which is an integral part of our system for finally adjudicating his guilt or innocence.") (internal quotation marks, alterations, and citation omitted).[4]

Plaintiffs acknowledge that Durst was never convicted of murdering Kathie.  (*See generally* Compl.)  Defendant contends that it is "precisely *because* [ ] Durst was never tried or otherwise afforded the opportunity to contest the allegations against him that application of the abatement doctrine is required" as "the abatement doctrine is grounded upon the principle that, unless a criminal defendant is afforded the full complement of rights associated with due process, no prosecution is legitimate."  (Def.'s Reply Mem. 9.)  However, the New York Court of Appeals' articulated due process rationale for the abatement doctrine concerns *convictions* where criminal defendants are denied the benefit of appellate review and Defendant has not cited to any New York State case where the abatement doctrine was applied before a defendant had been convicted.[5]

---

[4] The Second Circuit has "conclude[d] that finality is the paramount consideration" in the abatement context.  *United States v. Brooks*, 872 F.3d 78, 88 (2d Cir. 2017).

[5] Defendant cites to a series of cases where the New York Court of Appeals dismissed appeals from decisions of the the Appellate Division because the criminal prosecution had abated by reason of the defendant's death.  *See People v. Forbes*, 158 N.E.3d 895, 895 (N.Y. 2020) ("On the Court's own motion, appeal dismissed upon the ground that the criminal prosecution abated by reason of defendant's death."); *People v. Mason*, 74 N.E.3d 665, 665 (N.Y. 2017) ("On the Court's own motion, appeal dismissed upon the ground that the criminal prosecution abated by reason of defendant's death."); *People v. Craig*, 585 N.E.2d 783, 788 (N.Y. 1991) ("[A]ppeal . . . dismissed upon the ground that the criminal prosecution has abated by reason of defendant's death."); *People v. Fea*, 389 N.E.2d 840, 840 (1979) ("[A]ppeal dismissed, upon the ground that the criminal prosecution as to said defendant has abated by reason of his death.") (citation omitted); *People v. Cutrone*, 359 N.E.2d 436, 436 (1976) ("Appeal dismissed by the Court [s]ua sponte for the reason that the entire criminal prosecution has abated by reason of defendant's death.").  Without more, these cases do not evidence that New York has a practice of applying abatement *ab initio* prior to conviction.

17

Defendant does, in passing, cite to one district court case that, in part, supports the proposition that abatement *ab initio* is applied before conviction.  (Def.'s Mem. 8.)  In *United States v. Nojay*, 224 F. Supp. 3d 208 (W.D.N.Y. 2016), the court considered whether abatement *ab initio* would effectively destroy or seal a defendant's criminal complaint when he died before conviction, ultimately deciding that abatement does not destroy record of the criminal proceedings.  *Id.* at 214.  In its analysis, the court noted that "[o]rdinarily, when a criminal defendant dies *while his case is pending*, his death "abates . . . all proceedings had in the prosecution from its inception." *Id*. (citing *Wright*, 160 F.3d at 908 (emphasis added)).  However, *Wright,* the case *Nojay* relies on in support of this proposition, does not support the notion that abatement *ab initio* applies throughout the duration of a criminal case.  Indeed, the Second Circuit in *Wright* explicitly defined abatement as applying to convicted defendants:  "Ordinarily, when a convicted defendant dies while his direct appeal as of right is pending, his death abates not only the appeal but also all proceedings had in the prosecution from its inception." *Wright*, 160 F.3d at 908 (citation and quotation omitted).[6]

Defendant has not demonstrated that the abatement doctrine as applied by New York state courts to criminal defendants is applied before conviction.  Durst died after being charged

---

[6] Furthermore, the district court in *Nojay* was adopting in part a decision by a Magistrate Judge who had determined that "[t]he principle of abatement applies when a convicted defendant dies while his direct appeal as of right is pending.  Because Nojay was never convicted, the doctrine of abatement is inapplicable."  Dkt. No. 14 at 7 n.13 (16-MJ-600 Dkt. (W.D.N.Y.).).  Confusingly, while the district court stated that "Magistrate Judge Feldman determined that abatement is inapplicable, and I agree with that conclusion," the court continued on to examine whether abatement *ab initio* would effectively destroy the underlying criminal complaint.  *Nojay*, 224 F. Supp. 3d at 214.

but before he could be tried or convicted.  Accordingly, Defendant has not shown that the

abatement doctrine precludes Plaintiffs' wrongful death suit.[7]

However, even if New York state courts do apply the abatement doctrine to criminal

cases prior to a defendant's trial or conviction, the Court is not convinced that any abatement of

Durst's criminal proceeding should bar the suit at issue as untimely.  It is widely acknowledged

that the purpose of the abatement doctrine is to protect the due process rights of those who have

not had the chance to challenge their conviction on appeal or otherwise.  *See Libous,* 858 F.3d at

66 (citing "due process concerns" as supporting the abatement doctrine); Patrick H. Gallagher,

*The Aaron Hernandez Case: The Inconsistencies Plaguing the Application of the Abatement*

*Doctrine*, 53 Gonz. L. Rev. 263, 276–77, 280 (2018) (explaining that the "appellate rationale,"

which recognizes that "it is unjust to let a conviction stand because 'an appeal of right' has not

been heard and could not bring the case to a final resolution" is "recognized as the predominant

rationale in use"); Alexander F. Mindlin, "*Abatement Means What It Says": The Quiet Recasting*

*of Abatement*, 67 N.Y.U. Ann. Surv. Am. L. 195, 198–99 (2011) [hereinafter *Abatement Means*

*What It Says*] ("Abatement's defenders in the academy today cite a single principle to justify the

doctrine, as do courts in nine federal circuits.  Abatement, they say, is the guardian of the

appellate right.  It reflects the fact that a conviction untested--and untestable--by appeal is not

truly final, so that an injustice is visited on the defendant if such a conviction is allowed to stand.

---

[7] The Court acknowledges that N.Y. Crim. Proc. Law § 160.60 states that "[u]pon the termination of a criminal action or proceeding against a person in favor of such person, as defined in subdivision two of section 160.50 of this chapter, the arrest and prosecution shall be deemed a nullity and the accused shall be restored, in contemplation of law, to the status he occupied before the arrest and prosecution."  However, Defendant cites no case law standing for the proposition that this provision would apply to civil cases or, more specifically, would affect a statute of limitation in the civil context.

In the words of Rosanna Cavallaro--the most prominent scholar to have defended abatement--the doctrine springs from 'a larger premise [that] a conviction that cannot be tested by appellate review is both unreliable and illegitimate.'" (alteration in original) (citations omitted)).  Indeed, in applying abatement *ab initio*, courts have prioritized this due process right of criminal defendants over the interests of victims, despite the negative effects the doctrine can have on victims.  *See Libous*, 858 F.3d at 68 (applying the abatement doctrine while recognizing that the "consequences of abatement can be unsettling," and that "[i]n certain cases, they can surely be devastating to those affected by the defendant's conduct"); *see also* Sabrina M. Bierer, *The Importance of Being Earned: How Abatement After Death Collaterally Harms Insurers, Families, and Society at Large*, 78 Brook. L. Rev. 1699, 1701 (2013) ("While abatement accounts for the interests of the defendant's family, it ignores the interests of the victims, their families, and collateral third parties."); *Abatement Means What It Says* (noting that "with abatement *ab initio* victims are denied justice and a secondary harm is inflicted upon them").

In the context of this case, however, application of EPTL § 5-4.1(2) does not implicate the due process concerns underlying the abatement doctrine.  In enacting EPTL § 5-4.1(2), the New York legislature elected to extend the statute of limitations based upon the commencement of a criminal action, requiring a civil plaintiff to bring a wrongful death action within a year of *termination* of that criminal action.  As noted, under New York law, a criminal action terminates "with the imposition of sentence or some other final disposition[.]"  N.Y. Crim. Proc. Law § 1.20(16).  While "final disposition" is not a term defined by the Criminal Procedure Law, New York law allows for a final disposition for a variety of reasons unrelated to conviction.  *See, e.g.,* N.Y. Crim. Proc. Law § 180.70(4) (requiring that absent reasonable cause to believe defendant committed any offense, the court "must dismiss the felony complaint and discharge the

defendant from custody . . . or . . . exonerate the bail"); N.Y. Crim. Proc. Law § 180.10(6)

(providing that at arraignment the court must make a bail determination "unless it intends

immediately thereafter to dismiss the felony complaint and terminate the action"); N.Y. Crim.

Proc. Law § 160.50 (requiring that upon termination of a criminal action in favor of the person

accused all official records and papers be sealed).  Thus, as is clear from the plain language of

EPTL § 5-4.1(2), the New York legislature did not key the limitations clock to the *conviction* of

the criminal defendant.  This is in contrast to other provisions where the New York legislature

extended that statute of limitations for civil actions based on a defendant's conviction.  *See, e.g.,*

C.P.L.R. § 213-b ("Notwithstanding any other limitation set forth in this article or in article five

of the [EPTL], an action by a crime victim, or the representative of a crime victim . . . may be

commenced to recover damages from a defendant: (1) convicted of a crime which is the subject

of such action, .  .  .or (2) convicted of a specified crime as defined in [Exec. Law § 632-a 1(e)]. .

. . within ten years of the date the defendant was convicted of such specified crime."); Cal. Civ.

Proc. Code § 340.3 ("Unless a longer period is prescribed for a specific action, in any action for

damages against a defendant based upon the defendant's commission of a felony offense for

which the defendant has been convicted, the time for commencement of the action shall be

within one year after judgment is pronounced."); N.J. Stat. Ann. § 2A:31-3 ("Every action

brought under this chapter shall be commenced within 2 years after the death of the decedent,

and not thereafter, provided, however, that if the death resulted from murder, aggravated

manslaughter or manslaughter for which the defendant has been convicted, found not guilty by

reason of insanity or adjudicated delinquent, the action may be brought at any time.").

     The upshot of this analysis is that allowing this Action to go forward under EPTL § 5-

4.1(2) does not in any way compromise the due process rights that the abatement doctrine seeks

to protect.  If, for example, Plaintiffs could argue that liability should be imposed on Durst merely because of the commencement of his case, or sought to invoke the doctrines of res judicata or collateral estoppel from a conviction that was unchallenged on appeal because of Durst's passing, then the due process concerns that underlie the Abatement Doctrine would be implicated.  However, because the criminal action that was commenced against Durst has been terminated because of his death, rather than his conviction, Plaintiffs will not be able to invoke either res judicate or collateral estoppel.  Their case will stand or fall solely on its merits, which will not depend on a conviction that was unchallenged because of Durst's passing.  In this regard, EPTL § 5-4.1(2) is similar to other provisions of New York law that extend the statute of limitation for victims of certain crimes.  For example, New York Civil Practice Law and Rules § 215(8) extends the statute of limitations for certain crimes such as rape and child sex abuse, "at least five years from the termination" of a criminal action, "notwithstanding that the time in which to commence such action has already expired or has less than a year remaining." N.Y.C.P.L.R. § 215(8)(b).  As with § 5-4.1(2), this provision provides that the "injured party gets five years from the termination of the criminal action (regardless of the outcome)." N.Y.C.P.L.R. § 215 cmt. C215:8 (McKinney 2019).  Importantly, the courts have recognized that this type of statute of limitations extension for victims is a "remedial measure, making it easier for crime victims to redress the civil wrongs they have suffered." *Von Bulow by Auersperg v. Von Bulow,* 634 F. Supp. 1284, 1299 (S.D.N.Y. 1986).  As such, it should be "construed broadly to effectuate its purposes." *Id.*  Given the plain language of EPTL § 5-4.1(2), which extends the statute of limitations for victims of wrongful death based merely on the initiation and termination of a criminal action, and given its remedial purpose to provide victims a renewed opportunity to hold accountable those responsible for a wrongful death, the Court remains unconvinced that

22

here, where the rationale underlying abatement *ab initio* is inapplicable because there is no criminal due process concern, that a victim's wrongful death suit should be dismissed as untimely when it was brought under the precise circumstances contemplated by the New York legislature.

This conclusion finds no compelling resistance in the caselaw.  Indeed, it is telling that Defendant is unable to cite *any* authority that applies the abatement doctrine to EPTL § 5-4.1(2) or any similar provision.  While some courts have held that abated convictions cannot be used in related civil suits, *see e.g., United States v. Schumann*, 861 F.2d 1234, 1236 (11th Cir. 1988) ("[T]he abated conviction may not be used as the basis of liability in any related civil litigation against the estate." (citation omitted)); *United States v. Oberlin*, 718 F.2d 894, 895 (9th Cir. 1983) ("Similarly, an abated conviction cannot be used in any related civil litigation against the estate." (citation omitted)); *United States v. Pauline*, 625 F.2d 684, 684 (5th Cir. 1980) ("Abatement of the entire course of the proceedings has several significant effects: if the sentence included a fine, abatement *ab initio* prevents recovery against the estate and, ultimately, the heirs; the abated conviction cannot be used in any related civil litigation against the estate[.]"), these cases are inapplicable, as they only hold that an unchallenged conviction, owing to a defendant's death, cannot be used as the basis for civil liability.  EPTL § 5-4.1(2), does no such thing: it only extends the statute of limitations a year after the termination of a criminal case, even if that termination did not involve a conviction.

Moreover, there are no New York courts that have reached similar conclusions.  In fact, at least one New York court has held that abated convictions *can* be used in collateral civil proceedings.  In *Matter of Pikul*, 601 N.Y.S.2d 113 (App. Div. 1993), the Appellate Division held that an abated criminal conviction was admissible in a subsequent related civil action.  *Id.* at

115–16.  Specifically, the court held that a defendant's conviction for the murder of his wife, which had abated upon his death prior to sentencing, could be used civilly *as proof* that his estate forfeited any right to her property.  *Id.*  Here, Plaintiffs are not attempting to use an indictment or conviction as evidence of liability, they are merely relying upon the commencement of the prosecution to trigger a new statute of limitations.  As noted, unlike in *Matter of Pikul,* Plaintiffs will not benefit from any res judicata or collateral estoppel effect of a criminal proceeding.  That the use of abated convictions has been sanctioned in New York as, in and of itself, sufficient to "demonstrate a prima facie right to the relief sought" in a related civil action demonstrates that the use of a criminal proceeding here, which does not implicate any due process right, is legitimate.  *Id.* at 116.

Accordingly, the Court concludes that the abatement doctrine does not prevent the initiation of the lawsuit at issue.

### b.  New York EPTL Sections 5-4.1(2) and 11-3.2(a)(1)

Finally, Plaintiffs argue that the plain language of New York EPTL § 11-3.2(a)(1) "unequivocally states that a cause of action for wrongful death is not lost because of the death of the defendant" and therefore "notwithstanding the inapplicable and irrelevant federal common law doctrine of abatement *ab initio*, Durst's death cannot serve as a basis to strip Plaintiffs of their constitutionally guaranteed claim for wrongful death."  (Pls.' Mem. 7.)  EPTL § 11-3.2(a)(1) states that "[n]o cause of action for injury to person or property is lost because of the death of the person liable for the injury. . . . This section extends to a cause of action for wrongfully causing death and an action therefor may be brought or continued against the personal representative of the person liable therefor."  N.Y. EPTL § 11-3.2(a)(1).  Defendants argue that "[t]here is no evidence in the history of EPTL [§] 11-3.2 that the legislature intended

to extend a statute of limitation or vary the abatement doctrine, which was long in existence at the time that provision was added to the New York Statutes" and instead argues that the "provision merely modified the common law requirement that, upon a party's death, any 'cause of action' in a litigation fails as a matter of law." (Def.'s Reply Mem. 10.)

"When presented with a question of statutory interpretation, a court's primary consideration is to ascertain and give effect to the intention of the Legislature." *Nadkos, Inc. v. Preferred Contrs. Ins. Co. Risk Retention Grp. LLC*, 132 N.E.3d 568, 571 (N.Y. 2019) (citation and quotation marks omitted). Because "the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof." *Kuzmich v. 50 Murray St. Acquisition LLC*, 132 N.E.3d 624, 627 (N.Y. 2019) (quotation marks and citations omitted); *see also Nadkos*, 132 N.E.3d at 571 ("We have long held that the statutory text is the clearest indicator of legislative intent, and that a court should construe unambiguous language to give effect to its plain meaning.") (alterations, quotation marks, and citation omitted). "In the absence of a statutory definition, [New York courts] construe words of ordinary import with their usual and commonly understood meaning[.]" *Nadkos*, 132 N.E.3d at 571 (quotation marks and citation omitted). "Where the statutory language is unambiguous, a court need not resort to legislative history." *Walsh v. N.Y. State Comptroller*, 144 N.E.3d 953, 956 (N.Y. 2019) (citation omitted); *see also People v. Galindo*, 191 N.E.3d 1136, 1138 (N.Y. 2022) ("[A]s a general rule, unambiguous language of a statute is alone determinative.") (quotation marks and citation omitted). Further, a statute "must be construed as a whole and its various sections must be considered together and with reference to each other." *Walsh*, 144 N.E.3d at 956 (quotation marks and citation omitted).

While Defendant urges the Court to look to legislative history, Defendant does not argue that the statutory text of New York EPTL § 11-3.2(a)(1) is ambiguous.  (Def.'s Mem. 10.)  Here, where the statutory language is clear and unambiguous, that language alone is determinative: a cause of action for wrongful death is not lost because of the death of the person liable for the injury.  Accordingly, even if the abatement doctrine in New York applies prior to conviction, New York EPTL §11-3.2(a)(1) clearly states that Plaintiffs' cause of action for wrongful death— which accrued upon the initiation of a criminal action against Durst for the death of Kathie—is not untimely because of Durst's death.

Accordingly, Defendant's Motion To Dismiss is denied.

### III.  Conclusion

For the foregoing reasons, Defendant's Motion is denied.  The Court will hold a status conference in this case on April 25, 2023 at 11:30 AM.  The Clerk of Court is respectfully directed to terminate the pending Motion.  (Dkt. No. 50.)

SO ORDERED.

Dated:   March 31, 2023
         White Plains, New York

_____
          KENNETH M. KARAS
        United States District Judge