UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAMES MCCORMACK, VIRGINIA
MCKEON, and MARY HUGHES, *as co-
administrators d.b.n. of the Estate of
Kathleen McCormack Durst, et al.*,

                    Plaintiffs,

        v.

DEBRAH LEE CHARATAN, *as the
Executor of the Estate of Robert Durst*,

                    Defendant.[1]

No. 22-CV-795 (KMK)

OPINION & ORDER

KENNETH M. KARAS, United States District Judge:

Plaintiffs James McCormack ("James"), Virginia McKeon ("Virginia"), and Mary

Hughes ("Mary") (collectively "Plaintiffs"), the siblings of Kathleen McCormack Durst

("Kathie"),[2] in their capacities as the administrators of the estates of Kathie and her mother, Ann

McCormack ("Ann"), bring a wrongful death claim under New York law against Debrah Lee

Charatan ("Defendant") in her capacity as the executor of the estate of Robert Durst ("Robert"),

alleging Robert caused Kathie's wrongful death.  Before the Court are the Parties' cross-motions

for summary judgment and Defendant's motion to exclude Plaintiffs' expert testimony.  Because

---

[1] The Clerk of Court is respectfully directed to update the caption of this case to be consistent with the above.

[2] Considering the overlap in last names among the Parties, the Court refers to them by their first names for clarity.  The Court also notes while the Complaint spells Kathie's mother's name as "Anne," (*see* Compl. (Dkt. No. 1)), the Court uses the spelling reflected more frequently in the record, "Ann" (*see* Abrams Decl. Ex. 3, at 2 (Dkt. No. 311); *id.* Ex. 24, at 2; Pls.' Counter-Statement to Rule 56.1 Statement 2 n.3 (Dkt. No. 312)).

Plaintiffs have not shown a genuine dispute of material fact as to whether Ann suffered a pecuniary injury, the Court grants summary judgment to Defendant.

### I.  Background

#### A.  Factual Background

The following facts are drawn from the Parties' Statements and Counterstatements of Fact pursuant to Local Rule 56.1 and are not genuinely disputed unless stated otherwise.  Kathie married Robert on April 12, 1973.  (Def.'s Rule 56.1 Statement ("Def.'s 56.1") ¶ 1 (Dkt. No. 303).)  Their marriage was turbulent.  Defendant does not dispute that Robert physically abused Kathie, and Plaintiffs point to evidence that Robert financially and emotionally abused her as well.  (Pls.' Rule 56.1 Statement ("Pls.' 56.1") ¶ 7 (Dkt. No. 305); Def.'s Counter-Statement to Rule 56.1 Statement ("Def.'s Counter-56.1") ¶ 7 (Dkt. No. 310).)  At some point during the marriage, Kathie engaged a divorce attorney, who inquired as to whether any of Robert's assets might be available to Kathie in a hypothetical divorce settlement.  (Pls.' 56.1 ¶ 53.)

Kathie disappeared on January 31, 1982, and has not been seen since.  (Pls.' 56.1 ¶ 1; Def.'s Counter-56.1 ¶ 1.)  Many years later, Ann's estate brought an action in New York County Surrogate's Court to declare Kathie dead and establish her day of death; those proceedings ended with the Appellate Division of the New York Supreme Court finding a "high probability" that Kathie died the day she went missing.  *See In re McCormack*, 77 N.Y.S.3d 389, 390 (App. Div. 2018) (alterations adopted).  The Parties dispute what occurred on January 31, 1982.  Robert, and now his estate, have consistently denied any responsibility for her disappearance.  (*See, e.g.*, Def.'s Mem. in Opp'n re: Mot. for Summ. J. ("Def.'s Opp. to Pls.' MSJ") 4 (Dkt. No. 309) ("Even if Robert was present at the time of Kathleen's death—an allegation which Defendant denies . . .").)  Plaintiffs contend Robert killed her that evening.  (Pls.' Reply Mem. in Supp. re:

Mot. for Summ. J. ("Pls.' Reply") 4 (Dkt. No. 318) (describing as baseless Robert's claim that he drove Kathie to a train station the night she went missing); Pls.' 56.1 ¶ 13 ("Durst admitted that he killed his wife . . .").)  The Parties agree there is no eyewitness testimony or physical evidence that has yet been found that would prove Robert's culpability.  (Def.'s 56.1 ¶¶ 16–27; Pls.' Counter-Statement to Rule 56.1 Statement ("Pls.' Counter-56.1") ¶¶ 16–27 (Dkt. No. 312).)  And while there is some circumstantial evidence contemporary to Kathie's disappearance, the Parties dispute its meaning and weight.  (*See, e.g.*, Abrams Decl. Ex. 11, at 2 (Dkt. No. 311) (displaying a note written by Robert which reads: "town dump, bridge, dig, boat, other, shovel, car or truck rental," which Plaintiffs interpret as laying out Robert's plans to dispose of Kathie's body after her murder, and Defendant reads as consistent with other explanations for her disappearance); Pls.' Counter-56.1 ¶15 (referencing Robert's purchase of boots and trips to New Jersey's Pine Barrens in the days after Kathie went missing); *id.* (referencing Robert's conflicting alibis told to investigators and Kathie's family).)  At the time of Kathie's disappearance, she was a medical student at the Albert Einstein College of Medicine, studying to become a pediatrician.  (Pls.' 56.1 ¶ 55.)  She was not earning income when she disappeared.  (*See* Def.'s 56.1 ¶ 29.)

Other state court proceedings took place in the intervening years.  On November 11, 1982, Ann petitioned a state court for Temporary Letters of Administration, which would allow her to administer Kathie's estate in Kathie's absence.  (Pls.' 56.1 ¶ 2; Def.'s Counter-56.1 ¶ 2.)  Robert opposed the petition.  (Pls.' 56.1 ¶ 3.)  Ultimately, the New York Public Administrator was appointed temporary administrator of Kathie's estate.  (*Id.*)  In January 1990, Robert initiated an *ex parte* divorce proceeding in New York Supreme Court, Westchester County, contending Kathie had abandoned him on January 31, 1982, and voluntarily left the marriage.  (*Id.* ¶ 29.)  The Supreme Court granted that request, awarded Robert a divorce, and Kathie

received no settlement. (*Id.* ¶ 32.) Separately, the Public Administrator filed a petition for voluntary accounting in New York County Surrogate's Court on May 15, 1998. (*Id.* ¶ 46.)

The landscape around Kathie's disappearance changed meaningfully after Robert sat for extensive interviews with the entertainment company HBO for a television series called *The Jinx: The Life and Deaths of Robert Durst*, which aired in 2015. The series discussed the life and disappearance of Kathie; the death of Robert's neighbor Morris Black in Galveston, Texas, where, in resulting criminal proceedings, Robert was charged with capital murder but ultimately acquitted on self-defense; and the death of Susan Berman, a longtime friend of Robert's who died shortly after investigators contacted her about Kathie's disappearance. Robert made a number of potentially inculpatory remarks during the series. Most notably, in the final episode, Robert, unaware his microphone was still active, left the set, went to the bathroom, and spoke to himself for several minutes. That soliloquy included statements like: "What the hell did I do?"; "There it is. You're caught"; and "Killed them all, of course." (Pls.' 56.1 ¶ 15; Def.'s Counter-56.1 ¶ 15.) That Robert made these remarks is not disputed, but the order and timing in which he made them is. When made, these remarks had several other statements between them; they were presented out of order and spliced together for the documentary. (Def.'s Counter-56.1 ¶ 15.)

Shortly after the documentary aired, Robert was charged in Los Angeles, California, with the above-mentioned murder of Susan Berman, and convicted in 2021. (Pls.' 56.1 ¶ 18.) The jury convicted him of first-degree murder and found he murdered Berman to prevent her from acting as a witness against him elsewhere—presumably, if he were ever prosecuted for Kathie's murder. (*Id.*; *see also* Mack Decl. ¶ 12 (Dkt. No. 308).) Robert was later charged with Kathie's murder in Westchester County. (Pls.' 56.1 ¶ 35.) That prosecution ended with Robert's death on January 10, 2022. (*Id.* ¶ 37.) At the time of his death, an appeal of Robert's conviction in

California was also pending. (Def.'s Opp. to Pls.' MSJ 15.) The Westchester County District Attorney's Office later published a report explaining the basis for its decision to prosecute Robert. (Pls.' 56.1 ¶ 38.)

B. Procedural History[3]

Plaintiffs filed the Complaint on January 31, 2022. (Compl. (Dkt. No. 1).) On March 17, 2022, Plaintiffs moved for a temporary restraining order and other preliminary relief to enjoin Defendant from disposing of Robert's assets. (Emergency Mot. for O.S.C. (Dkt. No. 18).) The Court granted a temporary restraining order the same day. (Order (Dkt. No. 22).) The Court denied further relief and vacated the temporary restraining order on May 10, 2022, after a hearing. (Order (Dkt. No. 49).)

Defendant moved to dismiss the Complaint on June 9, 2022. (Mot. to Dismiss (the "Motion") (Dkt. No. 50).) After briefing, the Court denied the Motion on March 31, 2023. (Order (Dkt. No. 82).) Defendant answered the Complaint on April 17, 2023. (Ans. (Dkt. No. 93).) After extensive discovery, including motion practice over several subpoenas, Defendant and Plaintiffs both moved for summary judgment on February 21, 2025, and Defendant also moved to exclude Plaintiffs' expert on Kathie's lost wages. (See Def.'s Mot. for Summ. J. & Mot. to Strike Expert Testimony (Dkt. No. 301); Mem. in Supp. re: Def.'s Mot. ("Def.'s MSJ.") (Dkt. No. 302); Pls.' Mot. for Summ. J. (Dkt. No. 304); Mem. in Supp. re: Pls.' Mot. ("Pls.' MSJ.") (Dkt. No. 307).) Plaintiffs and Defendant opposed one another's Motions on March 17, 2025. (See Def.'s Mem. in Opp'n to Mot. for Summ. J. ("Def.'s Opp. to Pls.' MSJ") (Dkt. No. 309); Pls.' Mem. in Opp'n to Mot. for Summ. J. ("Pls.' Opp. to Def.'s MSJ") (Dkt. No. 313).)

---

[3] At least one other case brought by Plaintiffs concerning similar facts remains pending in state court. (See Pls.' Sur-Reply 3 n.1.) The Court omits that case's history from its discussion here.

Both Parties filed their Replies on April 1, 2025.  (Def.'s Reply Mem. in Supp. re: Mot. for

Summ. J. ("Def.'s Reply") (Dkt. No. 315); Pls.' Reply.)  Plaintiffs filed a sur-reply on April 22,

2025.  (Pls.' Sur-Reply (Dkt. No. 323).)  Defendant filed a sur-sur-reply on April 29, 2025.

(Def.'s Sur-Sur-Reply (Dkt. No. 325).)[4]  The Court heard oral argument on the Motions on

February 27, 2026.  (*See* Dkt. (minute entry dated Feb. 27, 2026).)

## II.  Discussion

### A.  Standard of Review

#### 1.  Motion for Summary Judgment

Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (same); *Psihoyos v.

John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In deciding whether to

award summary judgment, the court must construe the record evidence in the light most

favorable to the non-moving party and draw all reasonable inferences in its favor."  *Torcivia v.

Suffolk Cnty.*, 17 F.4th 352, 354 (2d Cir. 2021); *see also Horror Inc. v. Miller*, 15 F.4th 232, 240

(2d Cir. 2021) (substantially same).  "It is the movant's burden to show that no genuine factual

dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004);

*see also Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL

838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

---

[4] The Court notes that the sometimes overly personal tone of the Parties' briefing, *e.g.*, referring to the other side as "bone-headed," (Def.'s Reply 6), or "disingenuous," (Pls.' Sur-Reply 4), did not add to their otherwise thorough and zealous advocacy throughout this difficult and understandably personal case.

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration adopted, citation and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [the non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. Cnty. of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported

7

claims." *Geneva Pharms. Tech. Corp. v. Barr Laby's. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323–24).

When ruling on a motion for summary judgment, a district court should "consider only evidence that would be admissible at trial." *Latimer v. Annucci*, No. 21-CV-1275, 2023 WL 6795495, at *3 (S.D.N.Y. Oct. 13, 2023) (citing *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998)). "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (citation omitted)).

"As a general rule, 'district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage.'" *Parker v. Fantasia*, 425 F. Supp. 3d 171, 183 (S.D.N.Y. 2019) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"); *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on

8

summary judgment." (quotation marks omitted)).  Where, however, the evidence presents "a question of 'he said, she said'" the court "cannot . . . take a side at the summary judgment stage." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (quoting *Simpri v. City of N.Y.*, No. 00-CV-6712, 2003 WL 23095554, at *8 (S.D.N.Y. Dec. 30, 2003)); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash"); *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (stating that "where each side . . . tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court").  And, even if the non-movant's evidence is "thin, [a non-movant's] own sworn statement is adequate to counter summary judgment." *Scott v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that "[t]he credibility of [the plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact"); *Gunn v. Milani*, No. 20-CV-2681, 2024 WL 4124319, at *6 (S.D.N.Y. Sept. 9, 2024) (same).

### 2.  Motion to Strike Expert Testimony

At the summary judgment stage, a court can "decide questions regarding the admissibility of evidence, including expert opinion evidence." *Bah v. Nordson Corp.*, No. 00-CV- 9060, 2005 WL 1813023, at *6 (S.D.N.Y. Aug. 1, 2005) (citing *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997)).  "This is true even if the exclusion of expert testimony would be outcome-determinative." *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 351 (S.D.N.Y. 2005).  "If a proffer of expert testimony is excluded as inadmissible pursuant to [Federal Rule of Evidence] 702, the court must make the summary judgment determination on a record that does

9

not include that evidence." *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001).

Although it is the role of the jury to determine the credibility of an expert witness, it is the role of the trial court to serve as a "gatekeep[er]" to ensure that the expert testimony is reliable and relevant before it is presented to the jury. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (finding that the trial judge's gatekeeping obligation applies to all expert testimony); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993) (holding that the district court must ensure that a witness is qualified as an expert and "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand"). "The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *I.M. v. United States*, 362 F. Supp. 3d 161, 191 (S.D.N.Y. 2019) (alteration adopted) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)); *see also LVL XII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 635 (S.D.N.Y. 2016) (same). "[T]he trial judge has broad discretion in the matter of the admission or exclusion of expert evidence[.]" *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (citation and quotation marks omitted).

B.  Analysis

Plaintiffs assert only one cause of action in their Complaint—wrongful death. (Compl. ¶¶ 19–33.) Wrongful death claims in New York are authorized and governed by statute. *See* N.Y. E.P.T.L. § 5-4.1 ("The personal representative . . . of a decedent who is survived by distributes may maintain an action to recover damages for a wrongful act . . . which caused the decedent's death against a person who would have been liable to the decedent by reason of such wrongful conduct if death had not ensued."). Recovery is strictly limited by statute to "fair and

just compensation for the pecuniary injuries resulting from the decedent's death to the persons for whose benefit the action is sought." *Id.* § 5-4.3. "[T]he essence of the cause of action for wrongful death in this State is that the plaintiff's reasonable expectancy of future assistance or support by the decedent was frustrated by the decedent's death." *Gonzalez v. New York City Housing Auth.*, 572 N.E.2d 598, 601 (N.Y. 1991) (citations omitted); *see also Datskow v. Teledyne Cont'l Motors Aircraft Prods.*, 807 F. Supp. 941, 945 (W.D.N.Y. 1992) ("To recover on their wrongful death claims, [the] plaintiffs must present an evidentiary basis for a reasonable expectation of pecuniary loss from [the] decedents' death." (citing *Pub. Adm'r of Kings Cnty. v. U.S. Fleet Leasing of New York, Inc.*, 552 N.Y.S.2d 608, 609 (App. Div. 1990))). "[I]njuries for which damages may be recovered" thus include "[l]oss of support, voluntary assistance, and possible inheritance, as well as medical and funeral expenses incidental to death"—in short, only "injuries measurable by money." *Gonzalez*, 572 N.E.2d at 600–01.

Here, Plaintiffs have disclaimed any damages for nonpecuniary harm they initially sought, including for pre-impact terror or Kathie's pain and suffering. (Pls.' Opp. to Def.'s MSJ 2 n.1.) Plaintiffs have also disclaimed any punitive damages. (Def.'s Reply 4.)[5]

The Court begins and ends its analysis with pecuniary injury to Ann. The Parties agree for the purposes of these Motions that Ann was Kathie's sole distributee. (*See* Pls.' MSJ 10

---

[5] The disclaimer of punitive damages is consistent with the state of wrongful death law in New York as it was at the time of Kathie's death. As Defendant notes, punitive damages are not available under N.Y. E.P.T.L. § 5-4.3 for wrongful death claims where the decedent passed before September 1, 1982, *see* Margaret V. Turano, Practice Commentary, in N.Y. E.P.T.L. § 5-4.3 (McKinney's 2026), and are generally disfavored against an estate, (*see* Def.'s Opp. to Pls.' MSJ 5 n.1). Here, Plaintiffs brought an action in state court establishing Kathie's date of death as January 31, 1982, so punitive damages are not available. *See In re McCormack*, 77 N.Y.S.3d at 390. Damages for the decedent's conscious pain and suffering are recoverable in a survivor action in some circumstances, *see Santos v. City of New York*, No. 20-CV-6091, 2023 WL 5756513, at *3 (E.D.N.Y. Mar. 13, 2023), as Defendant notes, (*see* Def.'s Reply 6), but as noted above, Plaintiffs do not seek them.

11

("[T]he sole distributee of Kathie's Estate will be the Estate of Ann McCormack."); Def.'s MSJ 2 ("If we assume, however, that Robert is disqualified as potential distributee, it cannot be disputed that [McCormack] is Kathleen's sole distributee.").)  Accordingly, the only damages relevant to this cause of action are those relevant to Ann.  *George v. Mount Sinai Hosp.*, 390 N.E.2d 1156, 1159 (N.Y. 1979) ("A wrongful death action is brought not on behalf of the decedent's estate, but rather on behalf of the decedent's distributees, and the damages recoverable are not in compensation for the injury sustained by the decedent, but rather for the injuries suffered by the distributees as a result of the decedent's death." (citing N.Y. E.P.T.L. §§ 5-4.1, 5-4.3)).  The Parties here address several categories of possible pecuniary injuries.  The Court discusses each in turn.

### 1.  Loss of inheritance

Plaintiffs contend Ann's interests in inheriting from Kathie were frustrated by Kathie's death.  They discuss two potential sources of inheritance.  One is the share of Kathie's estate that is being held by the Public Administrator pending a determination on Robert's responsibility for her death.  The pecuniary damages theory here is clear, whether described as loss of inheritance or something else.  If there is a determination that Robert wrongfully caused Kathie's death, Ann's estate has an interest in this share and stands to claim it.  (*See* Pls.' MSJ 12–13.)  But while briefing these Motions, and repeatedly at oral argument, Defendant unambiguously disclaimed her share of Kathie's estate.  (*See* Def.'s Reply 3; Oral Arg. Tr. ("Hr'g Tr.") 28:14–25 ("The Court: . . . [M]y understanding is that the Durst Estate has said it's disclaiming any interest in that money, right?  Mr. Mack: Yes, Your Honor.  We have fully disclaimed [it] . . . . If I ever tried to come back and make that claim, I'm bound by . . . judicial estoppel.  I've made this argument in court papers, it's done.").)  The Court has no reason to deem this disclaimer

ineffective, at least because Defendant's admissions in court, relied upon here to secure a favorable decision, have estopped Defendant from claiming this share for herself.  (*See* Def.'s Sur-Sur-Reply 2–3; Hr'g Tr. 28:14–25.)  *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." (quotation marks omitted and alteration adopted)); *Early v. King*, 881 N.Y.S.2d 363, 363 (Sup. Ct. 2009) (Román, J.) (collecting cases for the proposition that, in New York state courts, "a party who takes a position in a prior judicial proceeding is estopped from taking a position inconsistent with the same in the same or subsequent proceeding").  There is accordingly no pecuniary injury on this basis; Defendant has forfeited whatever interest in this money she had, is now obligated by her own admissions to renounce it, and is estopped from doing otherwise in the Surrogate's Court.[6]  (*See* Def.'s Sur-Sur Reply 3 (explaining that executors of an estate have a fiduciary duty to disclaim an interest where "failure to disclaim the interest would be financially detrimental to the estate").)

The second possible source of lost inheritance is the value of a settlement from a divorce from Robert, if Kathie had sought and received one.  (*See* Pls.' MSJ 13–15.)  This fails to set out a pecuniary injury sufficient to survive summary judgment for two reasons.  First, even assuming Kathie's estate would have included those funds, Ann would have been expected to predecease

---

[6] There may be additional ministerial steps Defendant must take to renounce this interest, although the Parties did not brief them, so this disclaimer may not be self-executing as a matter of the Surrogate's Court proceedings.  *See, e.g.*, N.Y. E.P.T.L. § 2-1.11.  But Defendant's representations in this Court unambiguously include that she will "execute documents necessary, if any, to effectuate this disclaimer in Surrogate's Court."  (Def.'s Reply 3.)

Kathie if not for Kathie's untimely death, and thus, Ann had no expectation of receiving an inheritance in the normal course of Kathie's life.  (*See* Def.'s 56.1 ¶ 9; Def.'s MSJ 12.)  New York courts hold the expectation Ann would predecease Kathie means Ann did not suffer a pecuniary injury by lost inheritance because she, in all likelihood, did not stand to inherit from her daughter regardless.[7]  *See Larson v. Cabrini Med. Ctr.*, 669 N.Y.S.2d 172, 177 (Sup. Ct. 1998) (holding "[b]ased on the age of decedent's parents and on his life expectancy," the "parents of [decedent] had no reasonable expectation of inheriting from their son"), *disagreed with on other grounds*, *DeLuca v. Gallo*, 735 N.Y.S.2d 596, 600 (App. Div. 2001); *Ehrenkrantz v. IESI NY Corp.*, No. 37709/2007, 2011 WL 13173091, at *7–9 (N.Y. Sup. Ct. Feb. 8, 2011) ("In this case, there is no question that by the time decedent would have reached her life expectancy pursuant to the life expectancy charts, her father would have predeceased her. . . . [T]he court finds that the decedent's father has failed to establish that he has suffered a pecuniary loss, as that term is defined and interpreted in New York law."); *cf. Matter of Acquafredda*, 596 N.Y.S.2d 839, 844–45 & n.4 (App. Div. 1993) (explaining how New York courts divide proceeds among distributees in a wrongful death action based on their respective life expectancies).  That alone compels the conclusion that there was no pecuniary injury on these grounds.  Second, even if Ann did have an inheritance interest in a potential divorce settlement, any such interest is far too speculative to ask a jury to assess.  *See Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (explaining that summary judgment may not be defeated with "unsubstantiated speculation" (citation omitted)); *Prunier v. City of Watertown*, 936 F.2d 677, 680 (2d Cir. 1991) ("To be sure, a jury may not base its verdict on mere speculation,

---

[7] As the Court will discuss *infra*, that does not bar Ann from recovering on other categories of pecuniary injuries.

surmise or guesswork."). While Kathie had hired a divorce lawyer, Plaintiffs offer no basis in the record on which a jury could evaluate the probability she and Robert *would* have divorced had she lived; what, if any, share of Robert's property Kathie would have received in a divorce; and what, if any, of that share Ann would stand to inherit. All Plaintiffs have for the jury to consider is that a lawyer was hired; that he, at some point, asked about Robert's property; and that Robert had assets. (*See* Pls.' 56.1 ¶¶ 53–54.) But "[u]nder New York law, damages for wrongful death are not recoverable when they are based on contingencies which are 'uncertain, dependent on future changeable events, and thus, inherently speculative.'" *Mono v. Peter Pan Bus Lines, Inc.*, 13 F. Supp. 2d 471, 478 (S.D.N.Y. 1998) (quoting *Farrar v. Brooklyn Union Gas Co.*, 533 N.E.2d 1055 (N.Y. 1988)). And during oral argument, Plaintiffs' counsel described the divorce and any settlement therefrom as precisely such a contingency. (*See* Hr'g Tr. 51:7–15 ("The Court: . . . [B]ut we don't know, if there was a divorce, what the settlement would have been, right? Mr. Abrams: We don't know. That's an assumption.").)

Plaintiffs also extensively argue the *Riggs* doctrine entitles them to damages for loss of inheritance. *See Riggs v. Palmer*, 22 N.E. 188, 189–90 (N.Y. 1889) (generally holding that one who wrongfully kills another cannot recover from the other's estate). (*See* Pls.' MSJ 13; Pls.' Opp. to Def.'s MSJ 5–8.) The Court agrees with Defendant that this doctrine has little to do with this case. (*See* Def.'s Reply 4–7.) First, this case is not an action by Defendant to recover from Kathie's estate—it is an action by Plaintiffs under a statute requiring them to show their own injury. Thus, while *Riggs* was relevant in the proceedings in Surrogate's Court allocating Kathie's estate, (*see* Abrams Decl. Ex. 31, at 3), which is a case dealing with the inheritance laws, it does not dictate the outcome of this wrongful death case. The doctrine therefore typically is only relevant in wrongful death cases where the *wrongdoer* is a distributee, and the

15

question of who is a proper distributee of the decedent's estate lies at the heart of *Riggs*. *See In re Demesyeux*, 978 N.Y.S.2d 608, 611–12 (Sup. Ct. 2013) (collecting cases); *see also Guilmette v. Ritayik*, 334 N.Y.S.2d 223, 226–27 & n.2 (App. Div. 1972) (holding a plaintiff whose negligence contributed to the decedent's death was not precluded from recovering in a wrongful death action, but noting if the plaintiff's actions were criminal, *Riggs* might apply). Second, Defendant *already* has no prospect of recovering from Kathie's estate—she has clearly forfeited any share held in Robert's name that she could recover in the Surrogate's Court case. (*See* Hr'g Tr. 28:14–25.) *Riggs* accordingly does not bear on the result here.

### 2. Loss of support, services, and income

Plaintiffs argue that Kathie provided some support to her mother while she was alive, and would have continued to do so had Kathie not died. (*See* Pls.' MSJ 15–16; Pls.' Opp. to Def.'s MSJ 15–16.) But the record on this question is far too thin to find a genuine issue as to whether Kathie was providing or later would provide Ann with compensable support, and even if she were, how a jury might value that support. *See Anderson*, 477 U.S. at 256 (holding that a plaintiff may not defeat a summary judgment motion "without offering any concrete evidence from which a reasonable juror might return a verdict in his favor"); *Varda, Inc. v. Ins. Co. of N. Am.*, 45 F.3d 634, 639 (2d Cir. 1995) ("No reasonable jury could find [liability] on so sparse a record, and the court properly took that issue away from the jury."); *Kebede v. Johnson*, No. 02-CV-3315, 2006 WL 2591035, at *5 (E.D.N.Y. Sept. 8, 2006) (granting summary judgment to defendants where "there is insufficient evidence upon which a reasonable jury could return a verdict in plaintiff's favor").

First, Kathie's siblings uniformly testified that they were not aware of Kathie offering any compensable support to Ann while Kathie was alive. (*See, e.g.*, Mack Decl. Ex. H

("Virginia Dep."), at 90:7–11 (Virginia's testimony that she was "not . . . aware" of Kathie "supporting anybody in [her] family . . . financially"); *id.* at 91:10–13 (Virginia affirming that Kathie was not "providing any financial support" at "the time she disappeared"); Mack Decl. Ex. F ("James Dep."), at 148:21–149:5 (James testifying that he was "not . . . aware" of him, his siblings, or Ann "receiv[ing] any financial support from Kathie"); Mack Decl. Ex. G ("Mary Dep."), at 123:15–18 (Mary affirming that she was "[n]ot . . . aware of" Kathie "ever provid[ing] any financial support to [her] mother [or siblings] before she disappeared"); *see also* Hr'g Tr. 39:10–16 ("The Court: . . . I didn't see anything in the record that said that there was support at the time . . . up until January 31st, 1982, right?  Mr. McCarthy: That is correct.").)  That Kathie had not provided her family compensable support until her death makes Plaintiffs' case a steep uphill battle.  *See, e.g.*, *Schild v. Kingsley*, 773 N.Y.S.2d 20, 21 (App. Div. 2004) (affirming summary judgment for defendants on wrongful death claim where "the evidence showed that the decedent was an emancipated adult who did not provide pecuniary aid to any of his family, and that no survivor had a reasonable expectation of pecuniary loss resulting from his death").  Here, at most, there is Virginia's deposition testimony that Kathie was "a generous, good daughter" to Ann, that the siblings "all took care of and helped" Ann, that the siblings would "buy food, things like that" for Ann, and that the family was generally close.  (Virginia Dep. 86:24–87:12.)  But that alone cannot carry this claim to trial.  *See, e.g.*, *Kent v. Jones*, 239 N.Y.S.3d 832, 832 (Sup. Ct. 2025) ("[The p]laintiff must establish that she had a reasonable expectation of support . . . and therefore a pecuniary loss.  Here, other than the singular statement that [the decedent] was 'always going to take care [of the plaintiff],' there was no evidence . . . establishing that the nature of the relationship between [the decedent] and his mother—[the plaintiff]—involved financial support or that it was set up to provide support in the future, or that [the plaintiff]

17

expected or intended to receive financial support from her son.  As such, [the p]laintiff has failed to establish a cognizable pecuniary injury[.]”).

Second, there is close to nothing in the record as to what compensable support Kathie might have offered to Ann later in her life.  (Mary Dep. 120:2–121:3 (responding, when asked “how ha[s Ann] suffered pecuniary losses,” “How can I even say that?  I don’t know.  If she became a doctor, Kathie, and would help my mother.  You know, I don’t know.”); Virginia Dep. 87:4–6 (“I mean, and we all take care of our parents as they age and everything.”); James Dep. 149:6–21 (affirming that Plaintiffs were “not making [a] claim” that “they’ve lost a source of financial support”).)  At oral argument, Plaintiffs conceded the difficulty of this point in the context of damages for loss of services:

> The Court: . . . I didn’t see anything in the record that said that there was support at the time; you know, up until January 31st, 1982, right?
> Mr. McCarthy: That is correct.
> The Court: Okay. So . . . then how is it not speculative as to . . . what the level of loss of services is going to be?
> Mr. McCarthy: . . . [P]art of the issue is: Well, there is no evidence, but, you know, a lot of speculation as to where she would go in her career and everything else to be—
> The Court: That’s separate, right? That’s more of a loss of income issue, right?
> Mr. McCarthy: Right.

(Hr’g Tr. 39:10–24.)  That gap in the record further complicates Plaintiffs’ position.  *See McKenzie v. Hardy*, No. 18-CV-603, 2024 WL 5284890, at *5 (S.D.N.Y. Nov. 12, 2024) (recommending against an award of damages on New York state law wrongful death claim where, *inter alia*, “no evidence was presented regarding [the p]laintiff’s financial circumstances, whether she had a reasonable expectation of future financial assistance from [the decedent], or whether she had sustained any actual pecuniary losses as a result of [the decedent’s] death”), *report and recommendation adopted sub nom McKenzie v. City of Mount Vernon*, 2024 WL 5183186 (S.D.N.Y. Dec. 20, 2024).

18

Third, Plaintiffs offer no way for a jury to assess that support.  *See Ard v. Metro-North R.R. Co.*, 492 F. Supp. 2d 95, 102–03 (D. Conn. 2007) (holding in a FELA case where pecuniary harm was also a requirement of a wrongful death claim, that a plaintiff's verdict had to be set aside where the plaintiff had "provided no objective criteria from which the jury could arrive at [a] sum for loss of care damages" and that an award for pecuniary harm could not "stand when the only potential source of pecuniary value would be the jurors' own common sense and everyday experience" (discussing *Mich. Cent. R. Co. v. Vreeland*, 227 U.S. 59, 74 (1913), and *Norfolk & W. Ry. Co. v. Holbrook*, 235 U.S. 625 (1915))).  Plaintiffs correctly state they need not provide "dollars and cents proof" at summary judgment.  (*See* Pls.' MSJ 17.)  But they must offer something more than speculation based on possible income or support that is "uncertain [and] dependent on future changeable events.'"  *Farrar*, 533 N.E.2d at 1055 (holding such "inherently speculative" losses are "not compensable"); *see also Datskow*, 807 F. Supp. at 946 (same).

Loss of services that Ann would have had to pay for elsewhere would be one way to assess these damages.  *See Hyung Kee Lee v. New York Hosp. Queens*, 987 N.Y.S.2d 436, 441 (App. Div. 2014) ("[T]he standard by which to measure the value of past and future loss of household services is the cost of replacing the decedent's services." (quotation marks omitted)).  Plaintiffs' interrogatory responses represented that they sought damages for lost services, though their briefing on the cross-Motions for Summary Judgment does not do so in any detail.  (*See* Mack Decl. Ex. B, at 2 ("Plaintiffs seek to recover[] pecuniary losses sustained as a result of the wrongful death of Kathleen, including but not limited to, . . . loss of household services[.]").)  That waives this argument for the purposes of Plaintiffs' Motion.  *See Vargas v. APL Ltd.*, 431 F. Supp. 3d 82, 88 n.10 (E.D.N.Y. 2019) ("[B]ecause they do not raise this argument in their

19

motion papers, the argument is waived for summary judgment purposes."); *Almonte v. Averna Vision & Robotics, Inc.*, 128 F. Supp. 3d 729, 755 n.21 (W.D.N.Y. 2015) (same). Even so, the siblings' depositions uniformly reflect that Kathie did not provide any such services. (*See, e.g.*, James Dep. 149:22–150:3 (denying that Kathie "ever provide[d] [Ann] with any services . . . that [she] lost as a result of her disappearance and/or death"); Virginia Dep. 89:14–90:10 (same); Mary Dep. 124:10–125:2 (explaining Mary did not know whether Kathie provided Ann "those types of services").) In cases where awards for loss of services are made, there is something in the record as to the extent and nature of the lost services. *See, e.g.*, *Dontas v. City of New York*, 584 N.Y.S.2d 134, 136 (App. Div. 1992) (holding a wrongful death award to parents of a decedent 16-year-old child was "excessive" and reasoning "[a]lthough the decedent in this case provided extensive services to his family and contributed monetary support to the household, the award far exceeds any reasonable value which could be assigned to those lost services and financial contributions"); *Hanson v. Erie Cnty.*, 507 N.Y.S.2d 778, 780 (App. Div. 1986) (affirming in relevant part an award of pecuniary damages to parents of a decedent child when "the record support[ed] a finding that the father had a reasonable expectation of future assistance from the decedent" and the decedent "had been contributing substantially to his mother's support" prior to his death). There is nothing on this score in the record here.

Another way to quantify lost support is via lost income that would have been spent to support the plaintiff, which is the gravamen of Plaintiffs' loss-of-support argument here. (*See* Pls.' MSJ 15–16; Pls.' Opp. to Def.'s MSJ 15–16.) "[R]ecoveries for wrongful death should be strictly limited to that portion of the decedent's income which would have been contributed to support" the plaintiff. *Morgan Guar. Tr. Co. of N.Y. v. Texasgulf Aviation, Inc.*, 604 F. Supp. 699, 700–01 (S.D.N.Y. 1985) (citing *Gilliard v. New York City Health & Hosps. Corp.*, 430

20

N.Y.S.2d 308 (App. Div. 1980)); *see also Lamarca v. United States*, 31 F. Supp. 2d 110, 130 (E.D.N.Y. 1998) (applying New York law, awarding the plaintiff half of her decedent spouse's Social Security income because the plaintiff was "not entitled to claim as damages any portion of [decedent's income] attributable to [decedent's] upkeep or expense," and half of the income represented the actual "economic loss to the plaintiff"); *Sinkov v. Americor, Inc.*, 419 F. App'x 86, 91 (2d Cir. 2011) (summary order) (explaining "under New York law" that "post-death lost-earnings damages are not recoverable" where, *inter alia*, "no persons . . . reasonably expect to receive future support from" the decedent). That conclusion is intuitive from the statutory text, which requires "pecuniary injuries resulting from the decedent's death"—if there is no proof that lost income would have gone to the distributee-plaintiff's support, there is no pecuniary injury to the plaintiff from the decedent's lost income. N.Y. E.P.T.L. § 5-4.3(a). As they must, Plaintiffs concede lost income alone is not sufficient to establish pecuniary damages. (*See* Pls.' Opp. to Def.'s MSJ 21 ("A decedent's past personal consumption is a component of economic damages such as loss of future income, but not the sole component."); *id.* at 25 ("[D]amages should consider . . . '[the] probability of means to support parents, *if they are in need*[.]" (emphasis added) (quoting *Franchell v. Sims*, 424 N.Y.S.2d 959, 962 (App. Div. 1980)).)[8]

---

[8] Elsewhere in their briefing, (*see* Pls.' Opp. to Def.'s MSJ 29), Plaintiffs cite a Second Department case stating, "Nor are we persuaded that the Supreme Court should have further reduced the future lost earnings award by Social Security taxes, personal consumption, and work-related expenses which the decedent would have incurred." *Bryant v. New York City Health & Hosps.*, 673 N.Y.S.2d 471, 472 (App. Div. 1998). The Court is not persuaded this opinion is consistent with the text of the statute upon which Plaintiffs base this Action or the weight of the case law on this statute. Lost income can only be a "pecuniary injur[y] resulting from the decedent's death" to a plaintiff if the plaintiff had some expectancy in that income— and *Bryant* does not explain how a plaintiff could have any expectancy in income that the earner would have spent on themselves (or, more generally, income that would not have gone to the plaintiff's support). N.Y. E.P.T.L. § 5-4.3(a). New York courts thus routinely deduct the sorts of expenses discussed in *Bryant*. *See, e.g.*, *Halvorsen v. Ford Motor Co.*, 522 N.Y.S.2d 272, 276 (App. Div. 1987) (holding an award of a decedent son's entire lost earnings was "excessive"

The first hurdle for Plaintiffs is that "[t]he standard by which to measure the value of past and future lost earnings is the decedent's gross income at the time of death." *Klos v. New York City Transit Auth.*, 659 N.Y.S.2d 97, 99 (App. Div. 1997) (citing *Johnson v. Manhattan & Bronx Surface Transit Operating Auth.*, 519 N.E.2d 326, 328 (N.Y. 1988)).  Kathie was not earning income at the time of her death.  (*See* Def.'s 56.1 ¶ 29; Pls.' Counter-56.1 ¶ 29 (noting the New York Public Administrator's list of Kathie's assets, but failing to explain whether any of them constituted recurring income or whether Kathie realized any income from them during her lifetime).)  Plaintiffs have offered an expert report opining on what Kathie was likely to have earned in a career as a pediatrician, assuming she graduated medical school, matched for residency, and found work in pediatrics in New York.[9]  (*See* Mack Decl. Ex. I ("Muckler Rep.").)  While these assumptions are, of course, not certain, they are unlike those in other cases where courts found estimates of lost income too speculative to consider—for example, where the decedent had plans to open a business one day, *see Phelan v. State*, 804 N.Y.S.2d 886, 902 (N.Y. Ct. Cl. 2005), or was a grade schooler with professional athletic aspirations, *see McKenzie*, 2024 WL 5284890, at *5.  "Expected changes in the decedent's future earnings may be considered

---

because it "included neither a reduction for present value nor any reduction for personal consumption or expense," and the record showed the son "made no significant monetary contribution to the household prior to his death"); *Gilliard*, 430 N.Y.S.2d at 309 (requiring, to be deducted from lost earnings, "living expenses, such as clothing, carfare, luncheon expenses and room rent, however minimal"); *Dershowitz v. United States*, No. 12-CV-8634, 2015 WL 1573321, at *35 (S.D.N.Y. Apr. 8, 2015) (explaining, in applying New York substantive law to an FTCA claim, that a "decedent's personal consumption also is an appropriate deduction from projected earnings.").

[9] The Court assumes without deciding for the purposes of this motion that Dr. Muckler's report is admissible under Federal Rule of Evidence 702 as helpful for estimating Kathie's potential lifetime wages, and satisfies the test laid out in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

where it is probable that such changes were forthcoming," *Phelan*, 804 N.Y.S.2d at 902, and here, even Defendant's expert agreed Plaintiffs' expert, Dr. Muckler, fairly assumed it was "more likely than not" that Kathie would graduate medical school and become a pediatrician, (Abrams Decl. Ex. 45 ("Gaughan Rep.") 5.)

But Dr. Muckler does not consider what share of those earnings might have gone to support Ann, if any, or even what would remain after Kathie's own spending and saving—she only considers, from aggregate statistics, Kathie's probable lifetime earnings.[10]  (*See* Muckler Rep. 1–3.)  In Dr. Muckler's words, she was hired only "to determine how much in wages that *Kathleen Durst*," not her distributees, "lost over her lifetime by [Kathie's] not working."  (Mack Decl. Ex. J ("Muckler Dep."), at 14:17–19 (emphasis added); *id.* 34:19–23 ("Q: So th[e] methodology [for damages] involves adjustments for personal consumption, savings.  You didn't do any of that here, correct?  A: I did not."); *id.* 86:7–25 ("Q: . . . Do you have an opinion about whether the estate and her survivors would have received . . . every dollar of [her earnings] . . . ? A: . . . I don't have enough information to have an opinion.  Q: Well, . . . some of the money she would have earned throughout her career, she would have spent on herself . . . . Correct?  A: That's not what I did so I don't know.  Maybe her husband would have paid everything for her.").)[11]  So Dr. Muckler did not consider any information specific to Ann or to Kathie beyond

---

[10] Defendant's expert, however, did estimate what might have been left for Kathie's estate after a career of earnings as estimated by Dr. Muckler.  (*See* Gaughan Rep. 6–14.)  But, like Dr. Muckler, Dr. Gaughan did not consider any testimony or other evidence in the record that would bear on whether and how Kathie would have supported Ann from those earnings. (*See generally* Gaughan Rep.)

[11] Plaintiffs' suggestion that Robert's beneficence would mean *all* of Kathie's income would go to support Ann is unsupported in the record.  (*See* Pls.' Opp. to Def.'s MSJ 30 ("Durst[] himself admitted that he fully financially supported Kathie with all of her expenses during their marriage[,] thus negating or minimizing the necessity of deductions for personal consumption expenditures.").)  First, Plaintiffs only ground this argument in interviews where

Kathie's intended career path, because that information would have been unnecessary to reach the limited conclusion she was asked to reach. As Kathie was not obligated to support Ann and Plaintiffs have pointed to no concrete evidence of her previously doing so, her lost possible earnings alone are not enough to get them to a triable issue on pecuniary injury *qua* lost earnings. *See McNeill v. Rugby Joe's Inc.*, 707 N.Y.S.2d 483, 384 (App. Div. 2000) (granting the defendants' motion for summary judgment under New York dram shop law wrongful death action, which similarly has an actual injury element, where "it is undisputed that the plaintiffs' deceased son had neither a legal duty to support them, nor had he undertaken an obligation to contribute to their support").

Plaintiffs contend they could have painted a more detailed picture of lost support had they been "permitted to obtain damages discovery during the discovery phase of this [A]ction." (Pls.' Opp. to Def.'s MSJ 21.) But what Plaintiffs sought discovery on and seek to reopen discovery into is "all of [Robert] Durst's assets." (*Id.* at 22.) That request—which Magistrate Judge McCarthy carefully considered and denied, (*see* Tr. of Proceedings re: Decision 8:7–9:20 (Dkt. No. 274) ("[P]laintiffs seek documents regarding [Robert's] finances . . . . It is hard to contemplate how financial documents from 30 years later would be relevant to [Kathie's] cause of death or [Robert's] complicity therein, except for [P]laintiffs to figure out where the Estate's money is located today.")), in an order to which Plaintiffs did not object, (*see* Dkt.)—would yield no data of value in assessing loss of support. Plaintiffs do not explain how it would reveal

---

Robert explains that he "had paid for [Kathie's] education, college, medical school" and "everything [they] were doing" as "*she never earned any money*," something that would of course change if Kathie were employed. (Abrams Decl. Ex. 5, at 19 (emphasis added).) It is speculative that Robert would continue doing so while she did earn money, and doubly so when Plaintiffs have repeatedly argued Kathie intended to divorce Robert anyway. Second, as explained *supra* and *infra*, that Kathie may have had this income in its entirety is not enough to show what share of it, if any, Ann would have expected as support.

24

whether and to what extent Kathie would have supported Ann, or what support Ann would have needed or expected.

Accordingly, because loss of income is only recoverable in a wrongful death claim to the extent it bears on what share of that income the distributee might expect to receive, and the record is non-existent on that issue, Kathie's lost future income does not suffice to establish a genuine issue of fact as to pecuniary damages. *See In re Sept. 11 Litig.*, No. 21-MC-97, 2007 WL 3036439, at *3 (S.D.N.Y. Oct. 17, 2007) (applying Virginia wrongful death law, with a similar pecuniary injury requirement to the New York statute, to rule that the "plaintiff [parent] would not be permitted to prove [decedent son's] lost income without first proving some reasonable expectation by his parents that they would have received compensation from their son"); *Pub. Adm'r of Kings Cnty.*, 552 N.Y.S.2d at 608–09 (requiring, if "the decedent would [not] have been legally obligated to support the beneficiary," some "evidence that the decedent would have volunteered to do so," and reversing a denial of summary judgment where the record showed no "evidentiary basis for a reasonable expectation of pecuniary loss on the part of the [plaintiff] father"). And "where the record is devoid of supporting evidence for [Plaintiffs'] position, . . . grant[ing] . . . summary judgment" is appropriate. *Maresco v. Evans Chemetics*, 964 F.2d 106, 110 (2d Cir. 1992); *see also Uni-Rty Corp. v. Guangdong Building, Inc.*, 464 F. Supp. 2d 226, 230 (S.D.N.Y. 2006) ("[The p]laintiffs' failure of proof concerning this essential element requires that this [c]ourt grant summary judgment.").

***

That Kathie's loss was devastating to her mother and siblings is beyond doubt. Plaintiffs' continued anguish decades later shines clearly through the record. The Court does not minimize this tragedy or Plaintiffs' need for closure. But to avoid summary judgment on their claims as

25

Plaintiffs brought them, Plaintiffs had to show a genuine issue as to whether Ann suffered financial harm by Kathie's loss, and on this record, they have not.  This Court is not the first to note that the law of wrongful death is harsh in this regard.  *See, e.g.*, *In re Korean Air Lines Disaster of Sept. 1, 1983*, 807 F. Supp. 1073, 1086 (S.D.N.Y. 1992) ("The pecuniary loss rule . . . has been recognized as unduly harsh by an increasing number of jurisdictions which now allow recovery for some type of mental anguish and grief . . . ." (collecting statutes)), *aff'd in part, rev'd in part sub nom. Zicherman v. Korean Air Lines Co.*, 43 F.3d 18 (2d Cir. 1994), *aff'd in relevant part, rev'd in part*, 516 U.S. 217 (1996); *Ehrenkrantz*, 2011 WL 13173091, at *7 (describing a similar result as "harsh" and "unfortunate").  But that law governs this case, and so the Court must grant summary judgment to Defendant.

### III.  Conclusion

For the foregoing reasons, the Court grants Defendant's Motion for Summary Judgment and denies Plaintiffs' Motion for Summary Judgment.  Defendant's Motion to Strike Expert Testimony is denied as moot.  The Clerk of Court is respectfully directed to terminate the pending motions (Dkt. Nos. 288, 301, 304), enter judgment for Defendant, and close this case.

SO ORDERED.

DATED:     May 5, 2026
           White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

26